**CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, et al., Plaintiffs–Appellees,**

v.

**CENTRAL CARTAGE COMPANY and Central Transport, Inc., Defendants–Appellants.**

Nos. 94–3823, 95–1872 and 95–1976.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 27, 1995.

Decided Nov. 7, 1995.

Albert M. Madden (argued), Central States, Southeast & Southwest Area Pension Fund, Rosemont, IL, for Plaintiffs–Appellees.

Charles C. Jackson (argued), James L. Curtis, Mark A. Casciari, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, Leonard R. Kofkin, Donald J. Vogel, Fagel & Haber, Chicago, IL, Patrick A. Moran, Scott T. Stirling, Evans & Luptak, Detroit, MI, for Defendants–Appellants.

Before FLAUM, EASTERBROOK, and DIANE P. WOOD, Circuit Judges.

EASTERBROOK, Circuit Judge.

Central Cartage Company hires both regular and casual truck drivers. Casual drivers are covered by the Teamsters' national collective bargaining agreement and can hold the position for an indefinite duration, but they lack the job security associated with regular employment. Central Cartage made pension and welfare contributions for its casual drivers only if they were union members—which some were at the outset, others became eventually, and some never did. (A union-security clause in the collective bargaining agreement requires membership after 30 days on the job, except in right-to-work states.) The multi-employer pension and welfare funds filed suit demanding contributions on behalf of all drivers in the bargaining unit. The district court ordered Central Cartage to pay up. 1992 U.S. Dist. LEXIS 10768, reconsideration denied, 861 F.Supp. 1402, 1406–09 (1994).

The collective bargaining agreement requires pension and welfare contributions for all over-the-road drivers, a category that includes casual drivers. Just in case this was not clear enough, a supplemental agreement requires a defined payment for "each day or tour of duty worked by each casual employee". The master agreement does not distinguish according to membership status, so the funds were entitled to prevail. Central Cartage weakly protests, pointing to another clause in the contract excepting coverage of "those employees who have not designated a signatory union as their collective bargaining agent." This clause, however, deals with groups of employees who have elected to join unions other than the Teamsters, or who are not represented by a union. Its caption is "non-covered units." Once a union is certified to represent a given group of employees, as the Teamsters represent Central Cartage's casual drivers, the union is the group's "collective bargaining agent" whether or not a given employee becomes a member. This is the most fundamental principle of American labor law. And it cannot be a surprise to firms in the trucking industry, for we have held that employers must contribute to *these* funds, under *these* collective bargaining agreements, whether or not particular employees in a bargaining unit belong to the union. See *Central States Pension Fund v. Gerber Truck Service, Inc.*, 870 F.2d 1148 (7th Cir.1989) (en banc); *Central States Pension Fund v. Joe McClelland, Inc.*, 23 F.3d 1256 (7th Cir.1994).

■ More than two years after the district court granted summary judgment for the funds, Central Cartage filed a motion under Fed.R.Civ.P. 60(b)(2) asking the judge to reopen the subject. (The long delay between the initial decision and this appeal is attributable to an unrelated dispute that we discuss later.) The employer attached an affidavit of Jack Yager, one of the union's negotiators, who offered to testify that the Teamsters and the multi-employer bargaining group intended to cover casual drivers only if they were union members. The funds opposed this motion on several grounds: timeliness, the insufficiency of parol evidence to revise an explicit contract, and the impropriety of the arrangement under § 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(3), not to mention the union's duty of fair representation, if it has the meaning Yager attributes to it. See *Joe McClelland*, 23 F.3d at 1258. See also *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 34, 87 S.Ct. 1792, 1797, 18 L.Ed.2d 1027 (1967).

The district court denied this motion as untimely, which it was. Rule 60(b)(2) permits a court to revise a judgment because of "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b)". Central Cartage does not contend that Yager's affidavit would have been unavailable to a litigant that exercised due diligence (apparently Yager was not contacted until after the district court's decision); anyway, relief is available under Rule 60(b)(2) only within a year: "The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken."

Central Cartage asks us to disregard the limitations of Rule 60(b)(2). It tells us that *Ferrell v. Trailmobile, Inc.*, 223 F.2d 697 (5th Cir.1955), made an exception to Rule 60(b)(2) for "conclusive" evidence, an understanding of *Ferrell* that also appears in *United States v. McGaughey*, 977 F.2d 1067, 1075–76 (7th Cir.1992). But *Ferrell* itself does not say this—at least not explicitly. The question on the table was whether a judgment of foreclosure should be vacated because the under-

lying debt had been paid; the court explained that conclusive evidence of the debt's payment would defeat foreclosure. Modification of judgments to take account of developments such as payment is the domain of Rule 60(b)(5), not Rule 60(b)(2). *Ferrell* did not refer to any particular subsection of Rule 60(b). Although it did rely on equitable considerations, that approach is expressly authorized by Rule 60(b)(5). One of its clauses presents the question whether it is "equitable that the judgment should have prospective application". Cases in the fifth circuit since *Ferrell* have declined to extend its approach to Rule 60(b)(2) and have held that a litigant relying on new evidence as a reason to alter a judgment must demonstrate that the evidence could not have been obtained, in time, by diligent preparation. See *Johnson Waste Materials v. Marshall*, 611 F.2d 593 (5th Cir.1980).

*McGaughey* reserved judgment on the question whether we would adopt what we (then) understood to be the holding of *Ferrell*. Now that the limitations of that case are clear, we follow the fifth circuit, see *Johnson Waste Materials*, 611 F.2d at 597–99, in insisting that Rule 60(b)(2) be applied according to its text. The rulemaking process under the Rules Enabling Act is quite elaborate, with rounds of publication and cascades of committees preceding approval by the Judicial Conference, promulgation by the Supreme Court, and an extended delay while Congress considers whether to step in. See 28 U.S.C. §§ 2071–77. A power to create equitable exceptions to the rules would set these procedures at naught. In recent years the Supreme Court has repeatedly instructed judges to apply the rules as written, without imposing their own ideas of sound procedure on the results of this extended process. See, e.g., *Leatherman v. Tarrant County*, 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); *Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988); *Schiavone v. Fortune*, 477 U.S. 21, 106 S.Ct. 2379, 91 L.Ed.2d 18 (1986). Some rules are open-ended—Rule 60(b)(5) being a prime example—creating substantial discretion. But the need to consider the objectives in Fed.R.Civ.P. 1 when construing all of the rules does not justify disregarding limitations

explicitly built into them, including the diligence requirement of Rule 60(b)(2). We therefore hold that there is no exception to Rule 60(b)(2) for "conclusive" evidence.

■ Rule 60(b)(6) affords a catch-all power to reexamine judgments. Its availability here is doubtful in light of the holding in *Wesco Products Co. v. Alloy Automotive Co.*, 880 F.2d 981, 983 (7th Cir.1989), that Rule 60(b)(6) cannot be used to abrogate the limitations in Rule 60(b)(1) to (3). Even if we were to consider this question under Rule 60(b)(6), however, Central Cartage could not prevail. Appellate review is deferential, *Metlyn Realty Corp. v. Esmark, Inc.*, 763 F.2d 826 (7th Cir.1985), and the district court was entitled to conclude that this is not an appropriate case for relief from judgment. Yager's affidavit does not come close to the "dispositive" or "conclusive" evidence for which *McGaughey* calls. To the contrary, it is not even relevant. Yager does not purport to explain an ambiguous term in the contract. He submits, rather, that the drafters had an objective or understanding at variance with the text. *Gerber Truck Service* precludes the use of extrinsic evidence that was unknown to a pension or welfare fund. Central Cartage tells us that Yager's knowledge should be imputed to the funds. Maybe so, although the funds point out that nothing in the record suggests that a majority of their boards was aware of the supposed understanding. But the fact remains that the affidavit does not purport to decode ambiguous language; it expresses an understanding inconsistent with the language. As we emphasized in *Gerber Truck Service* and *Joe McClelland*, a multi-employer pension agreement is not a normal two-party contract for which evidence of idiosyncratic meaning may be used to depart from the objective meaning of the words. Yager's affidavit therefore could not justify resort to Rule 60(b)(6).

The parties' remaining dispute concerns the effect of a settlement agreement between the funds and Central Transport, Inc., a member of Central Cartage's corporate family. General Highway Express (GHE) entered bankruptcy some years back without paying all of its obligations to the fund. Part of the plan of reorganization approved by the bankruptcy court called for GHE to pay the funds (a little more than $233,000) over the next decade. GHE paid as required between 1983 and 1988, when the payments ceased. Central Transport, which merged with GHE in 1987, contends that they were made unnecessary by a settlement agreement in November 1988. In exchange for $3.4 million in cash, the funds released "[a]ll contribution obligations ... through the last date audited by the Funds for each company" in a list, including Central Transport. As the funds point out, however, the last audit date was in December 1986. Doubtless GHE owed the funds the money in December 1986, and doubtless Central Transport now "is" GHE (in corporate law the merged firm is a continuation of its predecessors), but, because the merger between GHE and Central Transport occurred after December 1986, these liabilities were not reflected in the audit to which the settlement refers. The settlement was designed to resolve all outstanding obligations, and the reference to the December 1986 audit defines which were knowable (and therefore covered) and which were not. We therefore agree with the district court that the settlement did not extinguish GHE's obligation (now Central Transport's) under the plan of reorganization in bankruptcy. We need not decide whether the funds would be entitled to prevail on the further ground that the bankruptcy converted the debt from a "contribution obligation" into some other variety. Cf. *In re West*, 22 F.3d 775 (7th Cir.1994).

AFFIRMED.

FLAUM, Circuit Judge, concurring in the judgment.

I concur in the judgment of the court's opinion. I write separately because I am unable to adopt the majority's analysis of *Ferrell v. Trailmobile, Inc.*, 223 F.2d 697 (5th Cir.1955). In addition, I am compelled to address the implications of the external ambiguity doctrine and the relationship between Central Transport's successor and guarantor liability.

## I.

The majority notes that in *United States v. McGaughey*, 977 F.2d 1067, 1075–76 (7th Cir.

1992), this circuit interpreted Ferrell as being an exception to the rule that a new trial cannot be granted under Rule 60(b) on the basis of new evidence unless proper diligence was used to secure that evidence before the original trial. While we declined to formally adopt the *Ferrell* rule in *McGaughey*, since it would not have affected the result in that case, *id.* at 1076, we had no difficulty understanding what *Ferrell* said. In *McGaughey*, we interpreted *Ferrell* as holding that if "practically conclusive evidence" is discovered after trial, a new trial can be granted even if the movant failed to exercise due diligence in obtaining that evidence before trial, in order to prevent a manifest miscarriage of justice. *Id.* at 1075–76. The majority now maintains that *"Ferrell* itself does not say this—at least not explicitly," *supra* Op. at 1314.

The *Ferrell* case dealt with a judgment for the recovery of an allegedly unmade installment payment toward the purchase of a truck trailer. After judgment was granted for the plaintiff, the defendant came forward with photostatic copies of money orders for the payment, endorsed by the plaintiff, and even an affidavit from the auditor of the plaintiff's bank showing that the money orders were deposited. The *Ferrell* court concluded,

> If, in fact, practically conclusive evidence shows that the appellant had actually paid all eighteen installments for the purchase of the trailer, it is obvious that the judgment should be set aside to prevent a manifest miscarriage of justice. In such a case, the ends of justice may require granting a new trial even through proper diligence was not used to secure such evidence for use at the trial.

*Ferrell*, 223 F.2d at 698 (citations omitted). This conclusion was based on principles of equity and was made without limitation to any particular kind of Rule 60(b) motion. *Johnson Waste Materials v. Marshall*, 611 F.2d 593 (5th Cir.1980) ("Our decision in *Ferrell* is fully justified by equitable considerations.")

Rules 60(b)(2) and 60(b)(5) are exactly the same today as they were at the time of *Ferrell*,[1] and the majority admits that *Ferrell* did not limit itself to a particular subsection of Rule 60(b). Yet the majority still attempts to cast *Ferrell* as a pure 60(b)(5) case. Actually, the *Ferrell* court's focus on the nature of the new evidence and mention of "proper diligence" seems more to invoke 60(b)(2) than 60(b)(5). Further, I find unconvincing the majority's suggestion that *Johnson Waste* held the *Ferrell* equitable exception not to apply to 60(b)(2). Although *Johnson Waste* tentatively sought to cast *Ferrell* as a 60(b)(5) case, *id.* at 599, and its implications are less than perfectly clear, *Johnson Waste* did not overrule *Ferrell*, nor did it specifically limit *Ferrell* to Rule 60(b)(5). Other circuits have read *Ferrell* and *Johnson Waste* as being consistent and as supporting a general exception to the Rule 60(b) due diligence requirement for the granting of relief from a judgment due to newly discovered evidence.[2]

---

**1.** Rule 60(b) reads as follows:

On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: ... (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); ... (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application. FED.R.CIV.P. 60b(2). The only amendment to rule 60 since 1955 occurred in 1987, and it did not affect the language or meaning of 60(b). FED. R.CIV.P. 60 advisory committee's note.

**2.** *See, e.g., Shook & Fletcher Insulation Co. v. Central Rigging & Contracting Corp.*, 684 F.2d 1383, 1385 n. 2 (11th Cir.1982) (interpreting both *Ferrell* and *Johnson Waste* as allowing a judgment to be reopened where newly discovered evidence is "practically conclusive," even if not obtained by due diligence); *United States v. Philatelic Leasing, Ltd.*, 794 F.2d 781, 788 (2d Cir.1986) (same interpretation of *Ferrell*); *Niedland v. United States*, 338 F.2d 254, 260 (3d Cir.1964) (same). District courts have reached the same conclusion. *See, e.g., Wilcox v. Petroleum Helicopters, Inc.*, 145 F.R.D. 406, 408 (S.D.Tex.1993) (finding that *Johnson Waste* and *Ferrell* held that grant of new trial could be appropriate "even though proper diligence was not used to secure [the new] evidence for use at the trial"); *Ope Shipping, Ltd. v. Underwriters at Lloyds*, 100 F.R.D. 428, 432 (S.D.N.Y.1983) (same for *Ferrell*).

Yet all of this is surely *not* to say that the *Ferrell* holding should be accepted as consistent with Rule 60(b)(2). Rule 60(b)(2) specifically requires that "newly discovered evidence" have been pursued with "due diligence" prior to the original trial. Although I disagree with the majority's reading of *Ferrell* and would prefer to simply reject *Ferrell*'s overbroad holding, I fully support the holding of the majority that there is no exception to Rule 60(b)(2)'s due diligence requirement.

## II.

In its brief Central Cartage Company ("Cartage") argued vigorously that the Jack Yager affidavit constituted "objective evidence" that the parties ascribed an "idiosyncratic meaning" to the Teamsters National Master Freight Agreement ("NMFA"), the collective bargaining agreement at issue in this case. The implication of Cartage's idiosyncratic meaning argument is that while the NMFA may say that employer contributions are required for "each casual employee," the parties actually intended the phrase "each casual employee" to cover only "union casual employees." While this argument may be ultimately unconvincing, the idiosyncratic meaning approach has been recently and explicitly affirmed in this circuit. And though it is not yet clear how this general principle of contract interpretation will ultimately be harmonized with the more specific rule relied upon by the majority (precluding the use of extrinsic evidence that is unknown to a pension or welfare fund to create contract ambiguity in pension and welfare benefits cases), *supra* at 1315, it is an analytic approach worthy of mention and further consideration.

Recently, in *AM International, Inc. v. Graphic Management Associates, Inc.*, 44 F.3d 572 (7th Cir.1995), we confirmed the vitality of the external ambiguity doctrine in contract law. Citing the classic case of *Raffles v. Wichelhaus*, 2 H. & C. 906, 159 Eng. Rep. 375 (Ex.1864), we affirmed in *AM International* that just because the meaning of a contract appears clear on its face (as the designation of the ship "Peerless" did), does not necessarily mean that the contract truly is unambiguous (since there may be two

ships named "Peerless"). 44 F.3d at 575. We also clarified what sort of evidence can be used to prove external ambiguity—"objective" evidence is acceptable, "subjective" evidence is not. And we defined these terms as follows:

> By "objective" evidence we mean evidence of ambiguity that can be supplied by disinterested third parties: evidence that there was more than one ship called *Peerless*, or that a particular trade uses "cotton" in a nonstandard sense. The ability of one of the contracting parties to "fake" such evidence, and fool a judge or jury, is limited. By "subjective" evidence we mean the testimony of the parties themselves as to what they believe the contract means. Such testimony is invariably self-serving, being made by a party to the lawsuit, and is inherently difficult to verify.

*Id.* We further affirmed in *AM International* that "[i]f the parties agree to an idiosyncratic meaning, the court will honor their agreement." *Id.* at 576. We have previously expressed this idiosyncratic meaning doctrine as follows: "[P]arties, like Humpty Dumpty, may use words as they please. If they wish the symbols 'one Caterpillar D9G tractor' to mean '500 railroad cars full of watermelons,' that's fine—provided [the] parties share this weird meaning." *TKO Equipment Co. v. C & G Coal Co.*, 863 F.2d 541, 545 (7th Cir. 1988).

In lieu of evaluating Cartage's argument against the standards of this general principle of contract law, the majority apparently concludes that a more narrow principle of disallowing extrinsic evidence of ambiguity in pension and welfare benefits cases trumps, choosing not to directly address the doctrinal tension. It is my view that such a fundamental principle of contract law deserves more scrutiny than this, especially when the foundation of the competing principle is somewhat questionable and its history so limited.

The majority's claim that *Central States Pension Fund v. Gerber Truck Service, Inc.*, 870 F.2d 1148 (7th Cir.1989) (en banc), "precludes the use of extrinsic evidence that was unknown to a pension or welfare fund," *supra* at 1315, overstates the holding of that case. The majority does not cite any partic-

ular portion of *Gerber* as containing this holding, probably because *Gerber* never reaches a conclusion of this generality. Judge Easterbrook's opinion in *Gerber* astutely notes many important policy reasons for limiting the use of extrinsic evidence by employers defending against pension fund claims, 870 F.2d at 1151–56, but it never actually finds that these policy considerations mandate a per se rule that extrinsic evidence unknown to a pension fund can *never* be used in pension contribution disputes. The concern in *Gerber* was with employers attempting to avoid their obligations to pension funds by pointing to defects in the formation of the contract creating their pension plans, since the obligations of pension funds to covered employees are independent of any employer's actual payments to the funds. *Id.* at 1153. *Gerber* never considered the defense of external ambiguity and actually focussed on defenses of another sort: "[d]efenses based on fraud in the inducement, oral side agreement, course of performance, want of consideration, failure of the union to have majority support ... the defenses *most* likely to breed litigation even when asserted in good faith, and ... create manifold opportunities for manipulation by crafty operators." *Id.* at 1154 (emphasis in original). Yet the defense of external ambiguity based on *objective* evidence of idiosyncratic meaning, as outlined in *AM International,* simply does not portend the same sort of fact-intensive litigation or opportunity for fraud as the defenses considered in *Gerber.*

The majority subsequently states that in *Gerber* and *Central States Pension Fund v. Joe McClelland, Inc.,* 23 F.3d 1256 (7th Cir. 1994), "we *emphasized* [that] ... a multi-employer pension agreement is not a normal two-party contract for which evidence of *idiosyncratic meaning* may be used to depart from the objective meaning of the words." *Supra* at 1315 (emphasis added). Yet neither of those cases even mentioned the idiosyncratic meaning doctrine or the external ambiguity doctrine. As noted above, the concern in *Gerber* was with defenses based on defects in contract formation and defenses that breed litigation and create opportunities for manipulation—not the external ambiguity defense set out in *AM International.* Our

decision in *Joe McClelland* likewise fails to support the majority's current interpretation of it. Although *Joe McClelland* never mentioned the idiosyncratic meaning doctrine, it did express the following proposition, which appears to be the foundation for the majority's treatment of multi-employer pension agreements as a special category of contract law: "extrinsic evidence may not be used to create an ambiguity in a pension or welfare agreement subject to ERISA." 23 F.3d at 1259 (citing *Bidlack v. Wheelabrator Corp.,* 993 F.2d 603 (7th Cir.1993) (en banc) *Id.* at 607–08 (lead opinion), *Id.* at 616–19 (dissenting opinion) (these two opinions speak for a majority of the court on this subject) and *Johnson v. Georgia–Pacific Corp.,* 19 F.3d 1184, 1187 (7th Cir.1994)). Not only is this statement dicta and without analysis or explanation, the citations given for it fail to support it. *Johnson* is not on point, and *Bidlack* is to the contrary.

The discussion cited in *Johnson* deals with an attempt by pensioners to avoid the implications of a plan amendment by putting on "evidence" that, at the time of the amendment, the parties did not consider how it would affect other elements of the plan, i.e., by showing a *lack* of evidence of reflection on the issue. We concluded that "[o]missions from the 'legislative history' of a pension or welfare plan may not be used to undermine or vary the terms of that plan." 19 F.3d at 1187 (citing *Bidlack*). Yet evidence that the parties didn't adequately *consider* the implications of their contract language is entirely different from evidence that, in using particular contract language, the parties intended a nonconventional *meaning,* which is what the idiosyncratic meaning branch of the external ambiguity doctrine is about.

This leads me to *Bidlack,* the seeming fountainhead of the majority's "rule" that extrinsic evidence cannot be used to create contract ambiguity in pension and welfare benefits cases. While the *Bidlack* dissent certainly points out the dangers of allowing extrinsic evidence in pension and welfare benefits cases, it does not go so far as to say that such evidence should *never* be allowed to establish external ambiguity in these cases. 993 F.2d at 616–19 (Easterbrook, J., dissent-

ing) (joined by Bauer, C.J., Coffey, and Manion, JJ.). More importantly and more disturbing, however, is the fact that the lead *Bidlack* opinion (which is cited in *Joe McClelland* as support for the rule excluding extrinsic evidence of ambiguity in pension and welfare benefits cases) does not in any way support the claimed "rule." In fact, the lead opinion in *Bidlack* explicitly adopts the more traditional contract law principle of idiosyncratic meaning:

> Although extrinsic evidence is admissible to show that a written contract which looks clear is actually ambiguous, perhaps because the parties were using words in a special sense, ... there must be either contractual language on which to hang the label of ambiguous or some yawning void ... that cries out for an implied term.

*Id.* at 608 (Posner, J.) (joined by Flaum, Kanne, J.J.) (internal citations omitted). This court's very divided decision in *Bidlack* simply cannot bear the weight that *Joe McClelland* directly places upon it and the majority implicitly places upon it. In fact, Judge Posner's opinion in *Bidlack* lays out the very doctrine of idiosyncratic meaning that today's majority avoids, despite Cartage's attempted reliance on it.

The majority may believe that the Yager affidavit so utterly fails to meet the *AM*

*International* standard for "objective evidence" that the external ambiguity doctrine need not be addressed. If so, I agree that the Yager affidavit does not qualify as "objective evidence" for the purpose of establishing external ambiguity under *AM International*. While the affidavit is technically not testimony of a "party," since Yager was the chief negotiator for the Teamsters, not Cartage, it hardly represents the kind of "objective" evidence that *AM International* described. Rather, the proffered testimony poses all the dangers that we worried about with "subjective" evidence: 1) the testimony concerns what parties to a contract *believed* it meant, rather than direct evidence of an objective fact observable in the world; 2) such evidence is easy to "fake" and inherently difficult to verify; and 3) such testimony could be self-serving.[3] *See AM International,* 44 F.3d at 575.

Further, the majority may be of the view that the external ambiguity doctrine and the special rule for pension and welfare benefits cases do not actually conflict. I see and have explicitly underscored the tension, which was raised by the parties, but perhaps resolution of the issue is best reserved for another day, when the facts of the case raise it more convincingly.[4]

---

**3.** While Yager may be a third party, he may not be a *disinterested* third party. In its brief Central States points to a number of reasons to question the objectivity of the Yager affidavit: 1) other Teamster negotiators of the NMFA categorically deny Yager's claim that only union casuals were intended to be covered; 2) such an agreement would have been illegal and would have exposed the Teamsters to breach of duty of fair representation claims; and 3) since 1993 Yager has been barred for life from holding any position with the Teamsters.

**4.** An example of such a case could be the following. Within a business whose work is very seasonal (lawn care, snow removal, private forest-fire-fighting, etc.) an employer and a union could agree that pension contributions would be based on employee hours worked during a given pay period. While this approach could result in greatly varying pension contributions over the course of a year (since hours worked would vary so greatly), the employer and the union representatives could reasonably agree that over a year's time the total amount paid in would be sufficient to cover the cost of the pension plans. Even if a union in this situation insisted that employees be

paid on a salary basis that was consistent throughout the year, it could reasonably agree to let the employer calculate its pension contributions according to this variable rate—thus allowing the employer to decrease its contributions when work and the resulting income were low, and make up the difference when work and income were high. With this understanding, a union and an employer might formulate a collective bargaining agreement that established employer pension contributions at "$20 per day worked by each employee." Both parties would intend the phrase "per day" to refer not to calendar days, but to 8 hour periods of work. For example, an employee working 4 hours per day for 5 days (20 hours) would have worked only 2.5 days for the purpose of calculating the pension contribution. If the pension fund administering the program later sued the employer for inadequate contribution, insisting that the phrase "per day" is unambiguous and obviously refers to calendar days, could the employer defend against this suit by invoking the idiosyncratic meaning doctrine and putting forward objective evidence (such as other documents reflecting this atypical but agreed-upon use of the word "day") that the phrase "per day" actually referred to

The majority concludes that "the fact remains that the [Yager] affidavit does not purport to decode ambiguous language; it expresses an understanding inconsistent with the language." *Supra* at 1315. But the external ambiguity doctrine is not about ambiguous *language;* and, by definition, an idiosyncratic meaning is inconsistent with general word usage. That's what makes the ambiguity "external," as opposed to "internal"; and that's why I find it inappropriate to respond to an argument based on this doctrine by summarily finding that we cannot even consider extrinsic evidence of idiosyncratic word usage.

### III.

One other issue appears worthy of flagging. Central States Pension and Welfare Funds ("Central States"), the plaintiffs in this case, initially sought to recover from defendant Central Transport ("Transport") on either of two theories: 1) guarantor liability or 2) successor liability. The underlying debt was originally incurred by the now defunct General Highway Express ("GHE"). GHE filed for bankruptcy in 1983, and in 1984 the Bankruptcy Court entered an order confirming GHE's plan of reorganization. Under this plan, Transport agreed to serve as guarantor for GHE's debt to Central States. During 1987, however, GHE was merged into Transport, which thereby became the successor to GHE's claims and liabilities. The subsequent 1988 settlement agreement between Central States and Transport, which purported to release all of Transport's contribution obligations through their last audit (December 1986), thus appears to raise a quandary: has the GHE debt been released or not? The district court held that Transport's *guarantor* obligation, which was established before the 1986 cutoff, was released by the settlement, but that its *successor* obligation, which commenced with the 1987 merger, was not released. Since the merger occurred after the 1986 cutoff date, the district court held, as we do today, that the successor liability was not released. I agree with the majority's analysis of the successor liability issue. However, since Transport was one company, which wore these alternative mantles of liability, I deem it appropriate to offer an explanation of why, though it has been stripped of the one, it remains clothed with the other. I would adopt the thorough analysis contained in the district court's opinion, *Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc.,* 861 F.Supp. 1402, 1413–15 (N.D.Ill.1994).

eight hour periods of time? That is the kind of situation that would force us to resolve the doctrinal tension noted here.

