**ILLINOIS CONFERENCE OF TEAM-STERS AND EMPLOYERS WEL-FARE FUND, Plaintiff,**

v.

**STEVE GILBERT TRUCKING, Defendant.**

**No. 92–3267.**

United States District Court, C.D. Illinois, Springfield Division.

Feb. 10, 1997.

Thomas H. Wilson, Michael A. Myers, Springfield, IL, for plaintiff.

Gordon W. Gates, James R. Potter, Springfield, IL, Stuart I. Cohen, Jeffrey Alan Ryva, Gerard A. McInnis, Peoria, IL, for defendant.

## OPINION

RICHARD MILLS, District Judge:

Under ERISA, an employer must keep "records with respect to each of his employees sufficient to determine the benefits due or which may become due to such employees."

Steve Gilbert Trucking, a sole proprietorship, signed an agreement that required him to make contributions to a joint labor-management employee benefit fund. The agreement bound the company to pay the fund a certain amount per hour of covered work performed.

On the fund's motion for summary judgment, the Court found Steve Gilbert Trucking liable for delinquent contributions, and that finding was affirmed. But uncertainty as to the amount of contributions Steve Gilbert Trucking owed the benefit fund required a bench trial.

The trial is over, and the Court still does not know how many hours of covered work Steve Gilbert Trucking performed during the relevant period. In fact, the Court does not know how many hours of work the company's covered employees performed.

Why? Because Steve Gilbert Trucking did not keep the records required by ERISA. And because the company breached its statutory duty, it is liable for contributions for every hour of work covered employees performed during any period when the company performed any covered work. Of course, due to Defendant's failure to keep required records the Court must derive the number of covered hours by dividing gross pay, less any bonuses, by the highest applicable prevailing wage.

1. Before trial, the parties filed a 13 page, 53 paragraph stipulation of facts. Most of the facts

## I. PROCEDURAL HISTORY

On October 23, 1992, Plaintiff filed this lawsuit to compel an audit of Defendant's payroll records and to recover delinquent contributions. On July 22, 1994, this Court granted Plaintiff summary judgment as to both liability and damages and entered Judgment in favor of Plaintiff and against Defendant in the total amount of $203,505.27, for delinquent contributions through December 31, 1992, and associated liquidated damages, audit expenses, attorneys' fees, and costs. On October 24, 1994, Defendant filed a petition pursuant to Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Central District of Illinois, Danville Division. The Bankruptcy Court modified the automatic stay pursuant to 11 U.S.C. § 362 to the extent necessary to permit this action to proceed to liquidate the amount of delinquent contributions owing to the Illinois Conference of Teamsters and Employers Welfare Fund. On March 23, 1995, Defendant appealed this Court's summary judgment decision to the United States Court of Appeals for the Seventh Circuit.

On December 18, 1995, the United States Court of Appeals for the Seventh Circuit affirmed this Court's finding of liability against Defendant and found that Defendant was bound by the Articles of Construction. The Seventh Circuit reversed this Court's entry of summary judgment as to the issue of damages. The Court of Appeals found a genuine issue of material fact as to the amount of delinquent contributions owing to the Fund. The Court of Appeals remanded this action for trial solely on the issue of damages.

## II. FINDINGS OF FACT [1]

A. *The Welfare Fund*

Plaintiff Illinois Conference of Teamsters & Employers Welfare Fund (the Fund) is an employee welfare benefit plan established by the Agreement and Declaration of Trust, as amended, made and entered into between the Illinois Conference of Teamsters and the Associated General Contractors of Illinois, Cen-

contained in the Court's findings of fact are derived from that stipulation.

tral Illinois Builders of the A.G.C. and the Southern Illinois Builders Association. The Fund is administered by Zenith Administrators, a third party administration firm which has served in that capacity since 1992. Mr. Michael Cairns of Zenith Administrators is the Fund Administrator. Prior to 1992, Ms. Karen Sidener served as the Fund Administrator.

The Fund provides qualified employees, their families and dependents, with medical or hospital care, compensation for injuries or illness resulting from occupational activities, life insurance, disability and sickness insurance, and accident insurance. The Fund determines eligibility for benefits based upon an established minimum number of hours for each participant within consecutive six month periods.

B. *The Employer*

At all relevant times, Defendant Steve Gilbert Trucking has been a sole proprietorship wholly owned by Mr. Steve Gilbert of Mansfield, Illinois. Mr. Gilbert is fifty-two years old and has worked in the trucking business all of his adult life. He originally began working with his father and formed Steve Gilbert Trucking in 1967. At all relevant times, Steve Gilbert Trucking owned between twenty and thirty trucks split approximately equally between 12 ton tandems and 22 ton semis and was and is engaged in the business of hauling sand, rock, gravel, dirt and similar construction materials from gravel pits owned by Steve Gilbert or third parties to construction sites within central Illinois. Additionally, Steve Gilbert Trucking hauls some fertilizer, agricultural lime, corn, and soybeans within a similar geographical area, has developed vacant land adjoining a gravel pit for residential sales, operates two rock quarries where gravel is mined for resale, and operates an aggregate recycling business. Defendant maintains no records from which it can be determined what tasks each of his employees were performing on a specific day, week or month.

During each month in which Defendant performed hauling work, at least some of Defendant's work consisted of hauling of construction materials to construction sites within the scope of Article II of the Articles of

Agreement. Employees of Defendant who were primarily drivers spent between 80 and 90 percent of their time driving.

C. *The Articles of Agreement*

On March 19, 1990, Steve Gilbert executed the Articles of Construction Agreement between the Associated General Contractors of Illinois and the Illinois Conference of Teamsters for the period May 1, 1989, through April 30, 1992. The Articles of Agreement provide in relevant part:

ARTICLE 2

Scope

. . . . .

3. This Agreement covers all employees transporting materials and/or performing work in classifications covered in Article 10 upon construction sites. This Agreement also covers drivers on trucks delivering aggregate material to stockpile on construction sites or to temporary plants or locations, the purpose of which is to serve particular construction sites, and drivers on any other vehicles operated on construction projects when used to defeat the purpose of this Agreement.

ARTICLE 11

Health and Welfare

1. The Employer agrees to contribute to the "Illinois Conference of Teamsters and Employers Welfare Fund" effective May 1, 1989 two dollars and ten cents ($2.10); effective May 1, 1990 two dollars and thirty cents ($2.30); and effective May 1, 1991 two dollars and fifty cents ($2.50) for each hour worked by each employee covered by this Agreement during the life of this Agreement.

On March 19, 1990, Steve Gilbert also executed a Participation Agreement which bound him to the terms and conditions of the Declaration of Trust for the Fund. Defendant is bound by the provisions of the Trust Agreement and all rules and regulations promulgated by the Trustees of the Fund under the Trust Agreement.

On August 16, 1990, Defendant completed a Report of Contributions for the following

two employees for July 1990: Dave L. Smith (14.0 hours) and George E. Gaitros (30.0 hours). Defendant forwarded that contribution report to the Fund accompanied by a check in the appropriate amount of $101.20. Defendant submitted no other contribution reports to the Fund.

On April 15, 1991, June 5, 1991, July 2, 1991, and July 26, 1991, the Fund by its administrator Karen Sidener sent Defendant letters informing Defendant that the Fund had not received Defendant's Reports of Contribution or payments for employees working during the months of August 1990 through June 1991. Defendant received each letter but did not respond to the Fund or submit any further Reports of Contributions or payments to the Fund. The Fund's records indicate that between August 1991 and August 1992, Defendant advised the Fund that Defendant had no work to report for the applicable month.

On August 31, 1992, the Fund through its administrator Michael Cairns sent Defendant a letter asking to audit Defendant's payroll records. In his letter, Cairns asked Defendant to have available for the audit "a source of information that shows actual hours worked by employees." Defendant produced no such records.

### D. *The Second Agreement*

In October 1992, after receiving the Fund's request to conduct an audit of Steve Gilbert Trucking's payroll records, Mr. Gilbert signed the Articles of Construction Agreement between the Associated General Contractors of Illinois and the Illinois Conference of Teamsters for the period May 1, 1992, through April 30, 1995. The Articles of Agreement effective May 1, 1992 have the same scope and covered work provisions as the prior Articles of Agreement. Only the contribution rates differ: from May 1, 1992 the rate was $3.30; from May 1, 1993 the rate was $3.80; and from May 1, 1994 the rate was $4.40 per hour for each hour worked by each employee performing covered work.

### E. *The First Audit*

On January 27, 1993, and April 20, 1993, Mr. Cairns performed a payroll audit of Defendant's records at Defendant's offices in Mansfield, Illinois. On April 20, 1993, Mr. Cairns was assisted by his associate Mr. Jack Hohrien. Mr. Cairns used the procedures recommended in the American Institute of Certified Public Accounts (AICPA) Guide. These procedures require that the accountant first total the employee W–2s to assure that they equal the total of the employer's quarterly federal tax returns (IRS Form 941) for the four quarters within the calendar year. This is known as the "gross wage test." To perform this test, Steve Gilbert Trucking supplied to Mr. Cairns the above-mentioned documents for 1991 and 1992. Mr. Cairns noted no exceptions between the employer's W–2s and the four quarterly 941s.

In the first audit, Mr. Cairns excluded 1990 from the gross wage test due to the fact that Steve Gilbert was signatory to the Associated General Contractors contract beginning on March 19, 1990. Accordingly, this would not satisfy the complete year test. Additionally, Mr. Cairns did not include any individuals receiving 1099 Miscellaneous Income Forms in his first audit due to the Fund's decision to await further judicial rulings on coverage of owner-drivers. That issue was resolved by this Court's decision in *Illinois Conference of Teamsters and Employer's Welfare Fund v. Mrowicki* ("Double M Trucking") which was affirmed by the Seventh Circuit at 44 F.3d 451 (7th Cir.1994).

### F. *The Defendant's Payroll System*

Defendant paid its employees weekly, Wednesday through Wednesday. Defendant paid some of its drivers on an hourly basis ranging from between 8 to 16 dollars per hour, depending upon the type of work being performed. Defendant did not maintain any records establishing which employees were paid what hourly rate during what time period. Other drivers were paid on a commission basis, receiving a commission equal to 25% of the price of each load of materials they delivered. Generally, Defendant paid tandem truck drivers hourly and semi drivers on a commission basis.

To calculate the weekly gross wage for each employee, Defendant required his employees to turn in bills of lading or "tickets." The tickets were issued by the entity from which the load originated and disclosed the

date, load, hours worked or cost of the load, truck number and in some cases the name of the driver performing the work. Defendant used the bills of lading to prepare freight bills (invoices) to send to customers. Defendant's drivers, as well as Defendant's employees who worked at the gravel pit or in the shop, also turned in time on slips of paper which recorded what they did during their work day and in some cases recorded the number of hours they worked. From the foregoing documents, Defendant calculated the weekly gross wage paid to each employee and then returned the daily documentation to the employee with the paycheck. Defendant did not maintain copies of the documents establishing the number of hours worked by each employee or identifying the specific tasks performed by the employee. In addition to regular pay, Defendant paid certain employees year-end bonuses.

In 1990 Defendant maintained handwritten payroll ledger cards for each employee showing gross weekly wages and deductions. Defendant began using a computer payroll register in 1991. The computerized payroll register included a numerical employee classification code on the top of each employee's payroll ledger sheet. The department codes listed on the top of Defendant's computerized payroll ledger sheets for 1991 through 1994 were as follows: (1) Shop; (2) Office; (3) Illinois Drivers; (4) Florida Drivers; (5) Gravel; (6) Florida Shop. Upon their initial employment (or entry into the computer system in 1991 if then already employed), each employee was assigned a classification which was accurate at the time of the employee's hire or entry. The employee codes were not entirely accurate. Defendant identified seven employees classified as Illinois drivers (code 3) who also performed additional work besides driving. The ledger cards also misclassified as nondrivers some employees who performed some driving work. However, Defendant maintained no additional records to establish when an employee changed classifications to perform a different job than that disclosed on the payroll ledger sheets.

During his first audit, Mr. Cairns examined the job classification codes of all employees of Steve Gilbert Trucking. Because

drivers are covered under the Articles of Agreement, Mr. Cairns determined from the payroll ledger cards each employee that was listed as a driver, his gross wages for each month (hours were not included on the cards), and compared the gross wages to the individual employee's W–2 Form supplied to Mr. Cairns by Steve Gilbert Trucking. Mr. Cairns found no discrepancies between the cards and W–2 Forms.

After performing the above steps in the audit, Mr. Cairns concluded that he had a complete and total listing of the employees who were drivers. Mr. Cairns then asked Mr. Gilbert if he had any time logs or trip tickets which would show the amount of time each driver had worked during the time periods in question. Steve Gilbert stated that he did not keep records of this kind in a permanent file and that this type of record was thrown away after the payroll check was prepared for each employee. Defendant was unable to produce any such records at trial.

Because Steve Gilbert Trucking did not maintain any records showing the amount of time each driver had worked during a given period or at what tasks they worked, Mr. Cairns used the following method to calculate unreported hours and amounts of contributions: He divided the amount of gross wages paid to each identified driver and by the prevailing wage rate applicable at the relevant time period. This derived figure was then multiplied by the hourly contribution rate required under the Associated General Contractors agreement for each time period to determine the total amount of contributions. A spreadsheet containing Mr. Cairns' calculations of unreported hours and applicable delinquent contributions for 1990–1992 was admitted into evidence.

Defendant's retained expert Mr. William Ringer, a C.P.A. employed by Clifton, Gunderson & Co., reviewed Mr. Cairns' calculations from his first audit. Mr. Ringer agreed that Mr. Cairns' mathematical calculations were correct. Mr. Ringer also admitted that based upon the records as maintained by Steve Gilbert Trucking, he would utilize the same procedure as Mr. Cairns did to calculate hours of covered work. Mr. Ringer was not retained to nor did he render any other

opinions regarding the audit performed by Mr. Cairns.

Subsequent to Defendant's filing of bankruptcy, Mr. Cairns performed a second payroll audit of Defendant's payroll records for the time period of 1993 and 1994. In performing that second audit, Mr. Cairns followed the same procedures as he had done during his first audit. In addition, the books and records maintained by Defendant, which Mr. Cairns reviewed, did not differ materially from those maintained by Defendant and which Mr. Cairns reviewed during the first audit.

During his second audit, Mr. Cairns also reviewed Defendant's 1099 Miscellaneous Income Forms for the purpose of identifying individuals believed to be owner-drivers covered under Article 25 of the Articles of Agreement. Defendant admitted that each of the individuals identified by Mr. Cairns as an owner-driver (except Mr. Carl Andres) owned only one truck which he or she drove pursuant to an equipment lease with Defendant. Under these leases, each owner-driver received between 76% and 90% of the price of each load as compensation; the remaining 24% to 10% went to Mr. Gilbert. All but four of these equipment leases were admitted into evidence. Defendant admitted that his relationship with the four individuals for whom leases could not be located was the same as for those for whom leases were produced. Mr. Gilbert also had contract purchase agreements with several of the individuals receiving 1099 Forms pursuant to which agreements the individual was purchasing his or her truck from Mr. Gilbert over a period of time. No other written agreements existed between Mr. Gilbert and the individuals claimed to be owner-drivers.

The individuals claimed as owner-drivers do not now nor have they ever been signatory to the Articles of Agreement, nor did they receive the standard of wages and fringe benefits or overall economic package set forth in the Articles of Agreement for work performed under the Agreement. Defendant did not enter into any subcontracts with any of the individuals claimed as owner-drivers for work covered by the Articles of Agreement which provided that they were subject to Article 8 of the Agreement or which contained any of the other matters required to be contained within bona fide subcontracts pursuant to Article 8 of the Agreement. Mr. Gilbert dispatched the individuals receiving 1099 forms and claimed to be owner-drivers and billed customers for their services pursuant to the identical procedure of freight bills utilized for employees receiving W–2 forms.

## J. *The Remaining Issue*

Defendant admitted that he did not have records and that he could not determine from the available records the number of hours worked by each individual performing work hauling construction materials to construction sites between 1990 and 1994.

Admitted as Plaintiff's Exhibits 26–30 were revised calculations of the amount of delinquent contributions for 1990–1994. The revised calculations subtracted the annual bonuses paid to Defendant's employees, used the highest prevailing wage under the Articles of Agreement (to yield the lowest number of hours through the derived calculation), and listed only individuals included by Mr. Cairns during his audits and identified as Illinois drivers on Defendant's payroll ledger cards or only those individuals who owned a single truck (excluding Carl Andres) and performed driving work for Defendant under an equipment lease.

## III. CONCLUSIONS OF LAW

This Court has jurisdiction over this action pursuant to Section 502(e)(1) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132(e)(1), and Section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a). Venue is proper within this District and Division pursuant to 29 U.S.C. § 1132(e)(2) and Local Rule 1.5, CDIL–LR 1.5.

The Fund is a "multiemployer plan" as that term is defined by ERISA. 29 U.S.C. § 1002(3).

The Trustees are fiduciaries of the Fund and are authorized to bring civil actions on behalf of the Fund and its participants and beneficiaries. 29 U.S.C. §§ 1102(a)(1), 1132(a)(3).

Defendant Steve Gilbert Trucking is an employer in an industry affecting commerce within the meaning of ERISA. 29 U.S.C. § 1102(5), (11), (12), and (14).

The Articles of Agreement constitute a binding obligation upon Defendant to, *inter alia*, make contributions to the Illinois Conference of Teamsters and Employers Welfare Fund in accordance with the terms and conditions of the Articles, Participation Agreement, and Declaration of Trust.

■ The Articles of Agreement are unambiguous and therefore resort to extrinsic evidence (including purported industry custom) is not appropriate to interpret those Articles' scope provision. *See Central States, Southeast and Southwest Areas Pension Fund v. Joe McClelland, Inc.*, 23 F.3d 1256, 1259 (7th Cir.1994) ("[E]xtrinsic evidence may not be used to create an ambiguity in a pension or welfare fund agreement subject to ERISA."); *see also Central States Southeast and Southwest Areas Pension Fund v. Central Cartage Co.*, 69 F.3d 1312, 1315 (7th Cir.1995) ("[A] multi-employer pension agreement is not a normal two-party contract for which evidence of idiosyncratic meaning may be used to depart from the objective meaning of the words."), *cert. denied,* — U.S. —, 116 S.Ct. 1419, 134 L.Ed.2d 544 (1996).

Defendant had an obligation under ERISA to maintain adequate records of the number of hours of covered work performed by his employees in order to permit a determination of the amount of contributions due the Fund. 29 U.S.C. § 1059(a)(1) ("Except as provided by paragraph (2) every employer shall, in accordance with regulations prescribed by the Secretary, maintain records with respect to each of his employees sufficient to determine the benefits due or which may become due to such employees."); *Central States Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 573, 105 S.Ct. 2833, 2841, 86 L.Ed.2d 447 (1985); *Michigan Laborers Health Care Fund v. Grimaldi Concrete, Inc.*, 30 F.3d 692, 696 (6th Cir.1994); *Carpenters Fringe Benefit Funds v. Able Bros. Const.*, 813 F.Supp. 643, 650 (N.D.Ill.1993).

■ Defendant breached his obligation to maintain records sufficient to determine the benefits due to his employees. Under the Articles of Agreement, the amount of benefits due to employees are determined based on the number of hours of covered work an employee performs. As the evidence amply demonstrated, Steve Gilbert Trucking does not have nor has it ever maintained records that might allow an auditor to determine with any certainty the number of hours of covered work each employee performed. Defendant argues that some of the required information can be derived from a review of the freight bills. But that methodology does not yield the desired results in every case and would frequently depend on Mr. Gilbert's ability to remember which employee drove which truck on which date.

Because Defendant did not keep the records required by statute, it is impossible to determine the exact number of hours of covered work performed by Defendant's employees for which contributions are due the Fund.

The individuals listed as receiving 1099 forms on Plaintiff's Exhibits 29–30 were owner-drivers within the scope of Article 25 and the decision in *Illinois Conference of Teamsters and Employers Welfare Fund v. Mrowicki*, 44 F.3d 451 (7th Cir.1994) and were not subcontractors within the scope of Article 8. Contributions for those owner-drivers are owing in the same manner as for Defendant's employees receiving W–2 forms.

Defendant argues that the number of hours worked by owner-drivers should be determined by dividing their gross pay by the standard hourly lease rate for a truck and driver. At first blush, this argument seems sensible. One might think that drivers who were paid both for their truck and their services (compared to employees who were paid only for their services) would earn an amount approximately equal to the standard hourly lease rate for a truck and driver. But Defendant offered no evidence to suggest that this was the case. Instead, the evidence showed that Defendant paid owner-drivers on a commission basis—they received between 76% and 90% of the price of each load they delivered. Thus, it is just as difficult to determine the number of hours the owner-drivers worked as it is to determine

the number of hours worked by the other drivers paid on commission. The Court finds that the Fund's method for calculating the number of hours worked by owner-drivers (gross pay minus bonuses divided by the prevailing wage) is reasonable under the circumstances.

The Fund's audits of Defendant's payroll records were performed in accordance with the procedures recommended by the American Institute of Certified Public Accountants Guide and were in all respects reasonable and appropriate in light of the Defendant's failure to maintain adequate records. In the Fund's revised calculations, all reasonable assumptions were made in favor of Defendant. The only solid evidence of inaccuracy in the Fund's calculations Defendant presented is evidence that some employees were paid bonuses and that most employees received less than the prevailing wage. The auditor's calculations take both these factors into account. First, the amount of all bonuses paid have been subtracted from each employee's gross salary before computing the number of hours worked. Furthermore, the auditor used the highest available prevailing wage category to compute the number of hours worked. Thus, Defendant is held accountable for fewer hours of covered work than it would be if each employee's actual wage rate had been used to calculate the number of hours worked.

The Fund's audits of Defendant's payroll records established an amount of delinquent contributions of $399,014.24. Once the Fund established to the best of its ability the number of hours of covered work performed by Defendant's employees for which contributions are owing by the Defendant, the burden shifted to the Defendant to present evidence of the precise number of hours of covered work performed by his employees or evidence to negate the reasonableness of the inference to be drawn from the Fund's evidence.

The Court agrees with the Sixth Circuit's position in *Michigan Laborers Health Care v. Grimaldi Concrete,* 30 F.3d 692, 697 (6th Cir.1994):

The benefits calculations under the collective bargaining agreement depend on knowledge of the specific number of hours worked by each employee on projects covered under the collective bargaining agreement. Give these calculation constraints, and Grimaldi Concrete's violation of its statutory duty, it is impossible to determine with any precision the amount of contributions due to the funds. We agree with the Ninth Circuit that, under these circumstances, an employer is liable for contributions on all hours worked during a period in which it has been demonstrated that some covered work was performed.

See also *Combs v. King,* 764 F.2d 818, 825 (11th Cir.1985); *Brick Masons Pension Trust v. Industrial Fence and Supply, Inc.,* 839 F.2d 1333 (9th Cir.1988); *Michigan Laborers' District Council Pension Fund v. Van Sullen Construction, Inc.,* 825 F.Supp. 165 (E.D.Mich.1993). Defendant's employees performed some covered work during each period in question. Thus, under *Grimaldi Concrete,* 30 F.3d 692, 697, Defendant is liable for contributions for every hour worked during those periods.

The Defendant failed to meet his burden of producing evidence as to the precise number of hours worked that were covered by the agreement or to negate the reasonableness of the Fund's calculations. Defendant argues that the Fund's calculations are inaccurate and thus insufficient to support a judgment. The Court agrees that the Fund's calculations represent only an approximation of the amount of delinquent contributions. But resorting to approximation is a result of Defendant's stark failure to obey the dictates of 29 U.S.C. § 1059(a)(1). The Court, therefore, finds that the amount of delinquent contributions owing the Fund by the Defendant is $399,014.24. The Articles of Agreement and Declaration of Trust further provide for a late payment charge of 12% of the delinquent amount which is $47,881.71.

The Articles of Agreement and Declaration of Trust further provide that an employer shall pay the costs of collection including the cost of performing the audit and attorney's fees. The reasonable costs of performing the audits in this case were $1,600.00.

■ An award of attorneys' fees, including fees incurred on appeal, is mandatory under 29 U.S.C. § 1132(g)(2)(D) once judgment is entered in favor of an employee benefit plan. *See Illinois Conference of Teamsters and Employers Welfare Fund v. Steve Gilbert Trucking,* 71 F.3d 1361, 1368 n. 6 (7th Cir. 1995). Plaintiff has submitted a fee petition and Bill of Costs. Upon resolution of any disputes regarding those fees, a final judgment, including attorneys' fees and costs, shall be entered.

*Ergo,* the Court finds in favor of Plaintiff, Illinois Conference of Teamsters and Employers Welfare Fund, and against the Defendant, Steve Gilbert Trucking, and further finds that Defendant is indebted to the Fund for delinquent contributions of $399,014.24, liquidated damages of $47,881.71, audit charges of $1,600.00, and reasonable attorney's fees and costs to be determined pursuant to 29 U.S.C. § 1132(g)(2)(D) and Local Rule 54.1.