99 F.3d 1412
 Prod.Liab.Rep. (CCH) P 14,781
Alan FREISLINGER, Plaintiff-Appellee,
v.
EMRO PROPANE COMPANY and Marathon Oil Company,
Defendants-Third Party Plaintiffs-Appellants,
v.
WEST SALEM KNOX COUNTY HATCHERY, INC., doing business as
George's Farm Supply, Third Party Defendant-Appellee.
 No. 95-2350.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 11, 1996.
Decided Nov. 6, 1996.
Rehearing Denied Dec. 19, 1996.
 
 Robert L. Douglas, Robinson, IL, Rex Carr (argued), Michael Barry Marker, Carr, Korein, Tillery, Kunin, Montroy & Glass, East St. Louis, IL, for Plaintiff-Appellee.
 Constantine L. Trela (argued), Michael W. Davis, Sidley & Austin, Chicago, IL, John Ewart, Jonathan L. Kazense, Beverly J. Mack, Craig & Craig, Mattoon, IL, for Defendants-Appellants.
 Bradley K. Bleyer, Marion, IL (argued), for West Salem Knox County Hatchery, Incorporated.
 Before FLAUM, EASTERBROOK and DIANE P. WOOD, Circuit Judges.
 DIANE P. WOOD, Circuit Judge.
 
 
 1
 On November 15, 1990, Alan Freislinger began his day at work for West Salem Knox County Hatchery (known as George's Farm Supply or George's) as he usually did by attempting to light the pilot light of a dehydrator machine. To his horror, the propane gas exploded violently, engulfing him in flames and leaving him severely burned. Freislinger sued the companies that had supplied the propane, that owned the tank in which it was stored, that manufactured the propane, and (initially) that supplied the chemical odorant added to the gas. Several of the defendants brought indemnification or contribution actions against George's. After a trial before the magistrate judge, to which the parties stipulated, the jury awarded Freislinger damages of $3,847,000 and the court dismissed the third-party claims against George's. The court then denied the defendants' post-trial motion for judgment as a matter of law and ordered a modest remittitur, bringing the award down to $3,388,277.81. Before this Court, Emro and Marathon argue that the instructions to the jury misstated the relevance of Freislinger's own negligence or assumption of risk, and also that the district court erred in granting judgment as a matter of law on Emro's third-party indemnification claim against George's. We agree that Illinois law requires reversal on both points.
 
 
 2
 * Freislinger went to work for George's in 1984. Beginning in 1988, he was assigned to operate a device that cut and dried wood chips for truck oil filters. The machine caused the wood chips, which George's acquired from a local lumber mill, to travel on a conveyor belt into a dehydrator. After the chips were dried, they were blown into a rotating saw, which cut them down to a size suitable for use in the filters. The dehydrator had been modified on a number of occasions before Freislinger's accident. It had initially been designed to dry grain and to operate on fuel oil, but the prior owner had modified it to run on natural gas. When George's bought it in 1980, they modified it to work with the wood chips. Later, George's modified the fueling system again, so that it would run on propane instead of a mixture of natural gas and field gas. A company called Blue Flame Gas performed the latter work for George's.
 
 
 3
 Rather than buy a propane tank, George's decided to lease one from Blue Flame. In the lease with Blue Flame, which Emro later took over when it bought out Blue Flame's operations, George's agreed
 
 
 4
 [t]o protect, indemnify and hold the Lessor harmless from and against any and all claims, demands, suits and liability for damages to any person or persons connected with or arising out of the use of said storage tank or with the use of propane gas, save and except those arising out of or resulting in the failure of the Lessor to properly repair such tank, or any mechanical defect therein, after receiving notice from the Lessee of such mechanical defect or defective condition.
 
 
 5
 Blue Flame installed the leased tank on George's property. A twenty-five foot pipe connected the tank to the dehydrator, and a master valve on top of the tank controlled the gas flow. The entire contraption, which was inside a shed, also had two more valves: one to control the flow of the gas to the pilot light and the other to control the flow of the gas to the main burner. In order to make the machine work, the operator had to open all three valves, set the flow of gas to the main burner, and light the pilot.
 
 
 6
 On the day of the accident, Freislinger walked through the shed and started up the various components of the wood chipper. As he walked through the building, he passed the dehydrator and checked the two interior valves to make sure they were in the "off" position. He then walked to the storage tank and opened the main valve. Returning to the shed, he opened the pilot valve and attempted to light it with a match. This effort failed, so he tried again. The second time, when he drew the match near the pilot, catastrophe struck. Not only did the gas ignite, but the lit gas cascaded from the pilot, in Freislinger's words, "like a waterfall." The burning gas in turn ignited a pool of propane that had gathered at his feet. Freislinger screamed and tumbled into the inferno of burning gas, before he managed to roll out of the pool of fire and run from the shed in flames.
 
 
 7
 Testimony at the trial indicated that the valves and pipes associated with this jury-rigged system leaked regularly, and that both the employees of George's (including Freislinger) and its owners were aware of these problems. The pilot valve handle had broken off and had been replaced with a handy pair of vise-grip pliers left attached to the valve assembly. Gas leaking from the pilot valve would, from time to time, catch fire. George's employees tried to remedy these problems by tightening the propane tank valve with a wrench and applying duct tape to the pipe leading to the pilot light assembly. Every night, they closed the tank valve to prevent propane from escaping into the shed through the various leaks in the pipes and valves, although testimony indicated that this measure was normally unnecessary for operators of propane tanks. Some of the employees testified that they cleared the air out of the shed in the morning with a fan before attempting to light the pilot, in order to remove possible accumulations of gas. There was also testimony that if the pilot did not light on the first try, employees would air out the shed before trying again. Freislinger did not take these extra precautions, either as a matter of course or on the morning of November 15, 1990. Other evidence indicated that operation of the blower motor could cause electric sparks, which plainly posed a different risk of fire.
 
 II
 
 8
 In July 1992, Freislinger brought this diversity action against Emro Propane Company, the supplier of the gas and owner of the tank, Marathon Oil Company, Emro's indirect parent and the manufacturer of the propane, and Phillips Petroleum Company, the supplier of a chemical odorant added to the propane. As noted above, Emro and Marathon then both brought third-party contribution claims against George's, and Emro also brought an indemnity action based on the language in the lease agreement. In January 1993, Freislinger settled his worker's compensation claims against George's, and the court found that this qualified as a good faith settlement for purposes of the Illinois Joint Tortfeasor Contribution Act, 740 ILCS 100/0.01 et seq. As a result, the court also dismissed Emro's and Marathon's contribution claims against George's. See Halleck v. Coastal Building Maintenance Co., 269 Ill.App.3d 887, 899, 207 Ill.Dec. 387, 397, 647 N.E.2d 618, 628 (1995) (defendants who settle in good faith with plaintiff may not be sued by joint tortfeasors for contribution); 740 ILCS 100/2(d). Emro's indemnification claim survived longer, but the court awarded George's summary judgment on that claim on the fifth day of trial. In January 1994, Freislinger reached a settlement with Phillips, and it too was dismissed from the case.
 
 
 9
 This left Freislinger's claims against Emro and Marathon, as they appeared in his fourth amended complaint. Count I alleged a strict product liability claim against Emro, asserting that the valve on top of the propane tank was "unsafe and insecure" and allowed "inadequately odorized gas" to enter the system. Count II was a negligence claim against Emro, on the ground that the propane Emro sold, which was odorized with ethyl mercaptan, was dangerous insofar as it was heavier than air, the odor dissipated after a time, and the odor could be masked by other odors. In addition, it claimed that Emro had breached its duty to warn Freislinger, the ultimate consumer, of these dangerous properties. Last, Count II claimed that Emro was negligent in selling propane to a facility that did not comply with state safety regulations set forth in 41 Ill.Admin.Code § 200.90, and 430 ILCS 5/2 (formerly 96 1/2 ILCS § 5602). Count III alleged the first two negligence theories of Count II against Marathon, and Count IV was a strict products liability claim against Marathon for inadequately odorizing the gas.
 
 
 10
 The centerpiece of the defense was the claim that Freislinger was responsible for the accident, either through assumption of risk or contributory negligence. With respect to assumption of risk, the defendants introduced evidence tending to show a variety of specific failings: (1) Freislinger was aware of longstanding and continuous leaks at the valve on the propane tank, (2) he knew that if the valve was not completely closed, gas could accumulate in the shed, (3) he knew from the leak that the valve was defective, yet he did not cut off the flow of gas after his first effort to light the pilot failed, (4) he also did not purge the shed of gas after the unsuccessful first try, (5) he knew in a variety of ways that accumulated propane was dangerous, and (6) the propane could have been smelled from 50 yards away. With respect to contributory negligence, the defendants introduced evidence to show that (1) Freislinger attempted to light the pilot when he smelled propane, (2) he continued to work in the building knowing that propane was leaking, (3) he failed to report to George's that the pilot light valve was leaking, (4) he failed to repair the leaking valve when he had the opportunity, (5) he failed to replace the pilot light line when he knew it was leaking, (6) he did not close the pilot light valve when the first match failed, (7) he failed to purge the pilot light housing and the main burner when his first attempt to light the pilot failed, (8) he did not properly close the valve on the propane tank the day before the accident, (9) he did not close the valve on the main burner the day before the accident, and (10) he repaired a regulator when he was not qualified to do so.
 
 
 11
 The case went to the jury on instructions that did not include the defendants' theory of assumption of risk and that presented only a narrow version of the contributory negligence defense, which permitted it to consider only three of the ten acts alleged by defendants to constitute contributory negligence (items 1, 6, and 8 above). Relying on 735 ILCS 5/2-1117, the court instructed the jury to apportion fault among the defendants, Freislinger, and George's with respect to the negligence counts, but it did not give a similar instruction for the product liability counts. The jury found that Emro bore 25 percent of the responsibility, Marathon 70 percent, and George's 5 percent for the negligence counts, and it found Emro liable on the strict product liability count. The final judgment held Emro and Marathon jointly and severally liable for damages of $3,388,277.81.
 
 III
 A. Jury Instructions
 
 12
 In 1986, the Illinois legislature dramatically altered the product liability landscape. Prior to the enactment that year of the Illinois Modified Comparative Fault Statute, Ill.Rev.Stat. ch. 110, § 2-1116, a defendant in a product liability action could plead only the affirmative defenses of assumption of risk and misuse of a product. Furthermore, in order to plead assumption of risk, the defendant had to show that the plaintiff knew of the specific risk that caused her injury. Court v. Grzelinski, 72 Ill.2d 141, 149, 19 Ill.Dec. 617, 620, 379 N.E.2d 281, 284 (1978). It was not enough to show that a plaintiff knew of the general risks associated with a product, nor did it suffice to show that a reasonable person would have perceived the risks. Williams v. Brown Manufacturing, 45 Ill.2d 418, 430, 261 N.E.2d 305, 312 (1970). The test instead was a subjective one, although the jury could infer subjective knowledge from factors like the plaintiff's "age, experience, knowledge and understanding, as well as the obviousness of the defect and the danger it poses." Id. at 431, 261 N.E.2d at 312. Contributory negligence that did not rise to the level of assumption of risk or product misuse was not a defense. Id. at 427, 261 N.E.2d at 310.
 
 
 13
 All of this changed with the enactment of § 2-1116 (which itself has since been amended by P.A. 89-7, § 15, but which does not apply here because its effective date was March 9, 1995). See 735 ILCS § 5/2-1116(e) (noting that the amended act only applies to causes of action accruing after the amendment's effective date). As it read from 1986 until the 1995 amendment, § 2-1116 provided:
 
 
 14
 Limitation on recovery in tort actions. In all actions on account of bodily injury or death or physical damage to property, based on negligence, or product liability based on strict tort liability, the plaintiff shall be barred from recovering damages if the trier of fact finds that the contributory fault on the part of the plaintiff is more than 50 percent of the proximate cause of the injury or damage for which recovery is sought. The plaintiff shall not be barred from recovering damages if the trier of fact finds that the contributory fault on the part of the plaintiff is not more than 50 percent of the proximate cause of the injury or damage for which recovery is sought, but any damages allowed shall be diminished in the proportion to the amount of fault attributable to the plaintiff.
 
 
 15
 735 ILCS 5/2-1116 (providing statutory language as written in P.A. 84-1431, Art. 4, § 1). This language represented a change from the prior Illinois rule restricting the doctrine of contributory fault in products liability cases, as applied in cases like Coney v. J.L.G. Industries, Inc., 97 Ill.2d 104, 73 Ill.Dec. 337, 454 N.E.2d 197 (1983); Simpson v. General Motors Corp., 108 Ill.2d 146, 90 Ill.Dec. 854, 483 N.E.2d 1 (1985). Under the 1986 statute, the type of fault that the jury could consider was to be the same for both strict tort liability and negligence cases. See generally J. Jeffrey Zimmerman, et al., "A Review of the Illinois Civil Justice Reform Act of 1995," 83 Ill.B.J. 282, 285-86 (1995); Comment, "Modified Contributory Fault and Strict Products Liability: Illinois' Silent Disposal of Misuse and Assumption of Risk Turns Back the Evolution," 23 John Marshall L.Rev. 247, 253 (1990); John C. Mulgrew, Jr., "Strict Tort Products Liability in Illinois--An Updated Exposition," 76 Ill.B.J. 854, 856 n. 81 (1987). See also Gratzle v. Sears, Roebuck and Co., 245 Ill.App.3d 292, 296, 184 Ill.Dec. 485, 487, 613 N.E.2d 802, 804 (1993) (fact finder must consider all fault attributable to plaintiff in product liability cases).
 
 
 16
 If this case had been submitted solely on the product liability theory, then the need for a new trial would be crystal clear. Although Freislinger argues that Emro and Marathon waived their objection to the jury instructions by failing to describe specifically enough what the flaw was, we find that the record shows that the assumption of risk objection was adequately preserved for appeal. (We note that the bulk of the discussion about the instructions took place off the record, and the parties simply presented their objections for the record in a more truncated form. This makes appellate review somewhat more difficult, but we are satisfied here that both the magistrate judge and Freislinger understood the gist of the defendants' objection, and that is enough for Fed.R.Civ.P. 51. See Briggs v. Marshall, 93 F.3d 355, 359 (7th Cir.1996) (objection was not waived where objection was fully discussed off the record, although the "better practice is to ensure that a fully explained objection is on the record"); Niehus v. Liberio, 973 F.2d 526, 529 (7th Cir.1992).) However, Freislinger points out that the jury also found in his favor on the negligence counts. This could be enough to support the verdict on its own, since the damages were not attributable to one count or another. See, e.g., McGrath v. Zenith Radio Corp., 651 F.2d 458, 471-72 (7th Cir.1981) (upholding damages awarded because at least one count justified the full amount).
 
 
 17
 With respect to the negligence counts, the jury received both assumption of risk and contributory negligence instructions, and it attributed none of the responsibility for the accident to Freislinger. Our task is to determine "whether the instructions as a whole were sufficient to inform the jury correctly of the applicable law and the theory of the defense." United States v. Rios-Calderon, 80 F.3d 194, 197 (7th Cir.1996), quoting United States v. Rice, 995 F.2d 719, 724 (7th Cir.1993). Here, the court instructed the jury that it could decide whether Freislinger was contributorily negligent in three particulars (items 1, 6, and 8 on the list above, respectively): (a) when he attempted to light the pilot when he allegedly detected propane, (b) when he failed to close the valve on the pilot line after he failed to get ignition with the first try, and (c) when he allegedly failed to close the valve on the tank at the conclusion of operations the day before. The court did not allow the jury to consider the defendants' other theories of contributory negligence, summarized above. In spite of the fact that district courts have substantial discretion in determining whether the evidence at trial warrants submitting theories to the jury, we are disturbed by the court's placing such tight shackles on the jury's ability to consider specific allegations of contributory negligence. While we could not predict how a jury might have ultimately regarded Freislinger's failure to purge the system by using the fan, which according to the evidence was the practice of other employees, the balance of evidence on both sides clearly made this issue (item 7 above) a jury question. In addition, if the court felt that the jury had to decide whether Freislinger failed to close the valve on the propane tank the day before the accident, it seems logical that it should also have considered whether he failed to close the valve on the main burner the day before the accident (item 9). The defendants' argument that Freislinger was negligent by continuing to work in the building knowing that the propane was leaking (item 2) is, we believe, fairly encompassed within the first theory given to the jury, since the only thing Freislinger did in the way of work was to strike the ill-fated second match. Given the extensive testimony about the knowledge George's had of the problems with the dehydrator, and the lack of evidence indicating that Freislinger had either responsibility or skill to make repairs himself, we find no error in the court's decision not to submit items 3, 4, 5, and 10 to the jury.
 
 
 18
 In sum, we find that a new trial is necessary because of problems with the jury instructions on both the product liability counts (because of the court's failure to instruct on assumption of risk in keeping with the Illinois Modified Comparative Fault Statute, § 2-1116), and the negligence counts (because of the court's decision to exclude certain theories of contributory negligence that were supported by the evidence).
 
 B. Joint or Several Liability
 
 19
 Section 2-1117 was enacted as a companion to § 2-1116, as part of the 1986 tort reform package. Like § 2-1116, § 2-1117 was amended further in 1995, by P.A. 89-7, § 15, but our case is governed by the pre1995 version of the law. The 1986 version of § 2-1117 provides as follows:
 
 
 20
 Joint Liability. Except as provided in Section 2-1118 [which called for joint and several liability in most environmental pollution cases regardless of relative fault], in actions on account of bodily injury or death or physical damage to property, based on negligence, or product liability based on strict tort liability, all defendants found liable are jointly and severally liable for plaintiff's past and future medical and medically related expenses. Any defendant whose fault, as determined by the trier of fact, is less than 25 percent of the total fault attributable to the plaintiff, the defendants sued by the plaintiff, and any third party defendant who could have been sued by the plaintiff, shall be severally liable for all other damages. Any defendant whose fault, as determined by the trier of fact, is 25 percent or greater of the total fault attributable to the plaintiff, the defendants sued by the plaintiff, and any third party defendants who could have been sued by the plaintiff, shall be jointly and severally liable for all other damages.
 
 
 21
 735 ILCS 5/2-1117 (providing statutory language as written in P.A. 84-1431, Art. 5, § 1). Invoking this statute, Emro and Marathon requested that the district court present the jury with a verdict form that would have incorporated an assessment of the fault of George's, along with the plaintiff and themselves. Although the district court obliged on the negligence claims, it denied the requested instruction on the product liability claims, which Emro and Marathon now claim was error.
 
 
 22
 To begin with, § 2-1117 does not distinguish between negligence and product liability theories for purposes of apportioning liability; thus, the court should not have done so either. Both claims on remand should follow the same methodology, which is set forth in the statute itself. The court must add up the total fault allocated to a defined set of potentially responsible parties. This set includes the plaintiff, the defendants sued by the plaintiff, and third-party defendants who could have been sued by the plaintiff. The term "plaintiff" is self-explanatory, and on these facts includes only Freislinger. The term "defendants sued by the plaintiff" means only those defendants who remain in the case when it is submitted to the fact finder--here, Emro and Marathon, but not Phillips, which settled. See Lannom v. Kosco, 158 Ill.2d 535, 543, 199 Ill.Dec. 743, 747, 634 N.E.2d 1097, 1101 (1994); Blake v. Hy Ho Restaurant, Inc., 273 Ill.App.3d 372, 376, 210 Ill.Dec. 5, 9, 652 N.E.2d 807, 811 (1995) ("The statute does not include former defendants or dismissed defendants."). Finally, the term "third-party defendants who could have been sued by the plaintiff" refers to anyone who could have been sued in tort. Under the Supreme Court of Illinois' decision in Kotecki v. Cyclops Welding Corp., 146 Ill.2d 155, 166 Ill.Dec. 1, 585 N.E.2d 1023 (1991), this language does not include an employer protected by the workers' compensation system. See also Lannom, which applies the Kotecki rule retroactively. Lannom, 158 Ill.2d at 539, 199 Ill.Dec. at 747, 634 N.E.2d at 1100. The amount paid under a workers' compensation award may reduce the total amount recoverable under a damages award, but the employer is not included in the § 2-1117 calculation because it is not a party who "could have been sued" by the plaintiff. Here, then, it would be error under Illinois law on retrial to instruct that George's "could have been sued" for purposes of § 2-1117, under either the negligence or product liability theories, or to require the jury to include George's in its apportionment of fault.
 
 C. Indemnification
 
 23
 Last, Emro argues that the court erred in granting summary judgment for George's on its contractual indemnity claim. The court interpreted the language in the lease agreement set forth above as not including an agreement by George's to indemnify Emro for Emro's own negligence, and it found that since the clause did not expressly indemnify Emro for its own negligence, it was "unenforceable as a matter of law." We review this conclusion de novo. See Cliff v. Board of Commissioners of Indianapolis, 42 F.3d 403, 409 (7th Cir.1994).
 
 
 24
 Illinois law does not require indemnity contracts to contain an express provision providing for the coverage of the indemnitee's own negligence in order for them to be enforceable. Instead, it contains only the more commonplace rule that indemnity provisions, when ambiguous, will not be interpreted in this way. See, e.g., Westinghouse Elec. Elevator Co. v. La Salle Monroe Bldg. Corp., 395 Ill. 429, 433, 70 N.E.2d 604, 607 (1946). Our starting point, however, is with the language of the contract, id. at 432-33, 70 N.E.2d at 606, which governs unless we find an ambiguity. Tatar v. Maxon Construction Co., 54 Ill.2d 64, 67, 294 N.E.2d 272, 273-74 (1973); Zadak v. Cannon, 59 Ill.2d 118, 120, 319 N.E.2d 469, 471 (1974) citing Westinghouse, 395 Ill. at 432-33, 70 N.E.2d at 606.
 
 
 25
 We find no ambiguity in the lease indemnity clause that would require further exploration. It plainly states that George's will indemnify Emro for "any and all claims ... connected with or arising out of the use of [the] storage tank or with the use of propane gas." Particularly given the nature of the substance they were talking about, this language is broad enough to encompass both negligence and strict liability claims related either to the tank or the propane. The only exception in the clause related to claims of failure to repair or mechanical defects when George's had properly notified Emro of the defects. It is undisputed that this exclusion did not come into play. The parties may have wanted to avoid litigation between themselves about who was "really" negligent--George's or Emro--and simply allocated the risk of claims arising out of the use of the tank and the propane to George's. It makes no difference if George's thinks this was a bad deal after the fact; the contract clause is clear and nothing in Illinois law prevents its enforcement. The existence of the particular contract takes this out of the general rule provided under the Contribution Act, under which the court correctly dismissed Emro's and Marathon's statutory contribution claims against George's. See Allison v. Shell Oil Co., 113 Ill.2d 26, 27, 99 Ill.Dec. 115, 116, 495 N.E.2d 496, 497 (1986); Dixon v. Northwestern Publishing Co., 166 Ill.App.3d 745, 752, 117 Ill.Dec. 581, 586, 520 N.E.2d 932, 937 (1988) (citing Allison and stating that express contractual indemnity provisions are not affected by the Contribution Act).
 
 
 26
 For the reasons stated, we REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.