142 F.3d 398
 40 Fed.R.Serv.3d 443, Pens. Plan Guide (CCH) P 23942P
 William E. DUGAN, Theodore Criel, et al., as Trustees of the
Midwest Operating Engineers Welfare and Midwest Operating
Engineers Pension Trust Funds, as Trustees of the Operating
Engineers Local 150 Apprenticeship Fund, and as Trustees of
the Local 150, I.U.O.E. Vacation Savings Plan,
Plaintiffs-Appellants, Cross-Appellees,
v.
SMERWICK SEWERAGE COMPANY, Defendant-Appellee, Cross-Appellant.
 Nos. 96-3618, 96-3724.
 United States Court of Appeals,
Seventh Circuit.
 Argued Oct. 22, 1997.
Decided April 16, 1998.
 
 Alan H. Auerbach (argued), Laura M. Finnegan, Baum, Sigman, Auerbach, Pierson & Neuman, for Plaintiffs-Appellants.
 Douglas A. Darch, John T. Murray (argued), James D. Jorgensen, Joshua M. Henderson, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Defendants-Appellees.
 Before WOOD, JR., MANION, and ROVNER, Circuit Judges.
 ILANA DIAMOND ROVNER, Circuit Judge.
 
 
 1
 The trustees of various union health and welfare funds filed suit against Smerwick Sewerage Co. pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq., in an effort to collect on contributions that the Funds contended were due under the "owner-operator" provision of the collective bargaining agreement to which Smerwick is a party. The district court granted summary judgment in favor of Smerwick. Dugan v. Smerwick Sewerage Co., No. 95 C 3223, 1996 WL 535306 (N.D.Ill. 1996). It concluded that Patrick Moriarty, the former owner of the company, was not a "relative" of the present owner (his wife, Elizabeth Moriarty) as that term was defined in the agreement during the relevant time periods; thus, the company did not owe additional contributions on his behalf under the "owner-operator" provision of the agreement. It also rejected the Funds' alternative contention that Patrick Moriarty remained a co-owner or a de facto officer or director of Smerwick. The trustees of the Funds appeal the district court's summary judgment ruling, and Smerwick cross-appeals from the summary denial of its request for discovery sanctions pursuant to Fed.R.Civ.P. 26(g). We affirm.
 
 I.
 
 2
 Smerwick is a small construction subcontractor with two to four employees that installs sewer and water lines for homes and small businesses. Patrick Moriarty founded the company in or about 1968 and was its sole shareholder and president for a number of years. He married Elizabeth in 1976. She began performing administrative work for the company, while Patrick performed on-site labor, operated the heavy equipment, and supervised the other employees. Purportedly during or as of 1983, when Patrick was diagnosed with cancer that was expected to be fatal, Elizabeth became the sole owner of the company and elected herself president. Happily, Patrick recovered and returned to work for the company in 1984. Although there is no evidence that Patrick re-assumed any ownership interest in the company, his day-to-day responsibilities upon return were otherwise the same as they had been before he was diagnosed with cancer. He also served as a director of the company in 1988 and 1989 but held no formal office thereafter.
 
 
 3
 From at least 1984 to date, Smerwick has been obligated to make contributions on behalf of covered employees, including Patrick Moriarty, to the pension, welfare, apprenticeship, and vacation savings plan funds of the International Union of Operating Engineers, Local 150, based on the hours of work these employees performed for the company. In relevant part, the 1987 and 1990 versions of the collective bargaining agreement imposing that obligation provided as follows:
 
 
 4
 [T]he parties recognize that individuals employed by corporations who are party to this Agreement may perform both bargaining unit and non bargaining unit work. Certain of these employees receive compensation in such a manner that it is difficult to determine for purposes of fringe benefit contributions the precise number of hours which are spent performing bargaining unit work. It is therefore agreed that when an employee who is employed by a corporation, performs both bargaining unit work and non bargaining unit work and who
 
 
 5
 A. Is a shareholder, officer and/or director of the corporation or
 
 
 6
 B. Is a relative (father, mother, son, daughter, brother, sister) of a shareholder, officer and/or director of the corporation
 
 
 7
 the Employer shall be required to make contributions on behalf of such employee on the basis of 168 hours for each month in which the employee receives any compensation from the corporation based on the contribution rates established herein.
 
 
 8
 (Emphasis ours.) This is the provision referred to as the "owner/operator" provision of the agreement. In the 1995 collective bargaining agreement, the parenthetical definition of the term "relative" in this provision was modified to read "father, mother, son, daughter, brother, sister, husband, wife, in-law of a shareholder, officer and/or director of the corporation." (Emphasis again ours.)
 
 
 9
 In June 1993, Smerwick's books were audited on behalf of the Funds, which concluded that the company owed additional contributions on behalf of Patrick Moriarty for certain months in 1988 through 1993 pursuant to the owner/ operator provision of the collective bargaining agreement. The Funds believed that as the spouse of the owner of the corporation, Patrick constituted a "relative" for which the company was obligated to make contributions based on 168 hours in any month in which Patrick received compensation from Smerwick. Smerwick balked, prompting the Funds to file suit. Smerwick acknowledged that contributions were due on Patrick's behalf pursuant to the owner/operator provision for the period of time in 1988 and 1989 when Patrick himself served as a director; it similarly acknowledged that additional contributions were due for the period of time in 1992 and 1993 when Patrick's daughter Ellen served as a director. Smerwick denied that any additional contributions were due under the owner/ operator provision based on Patrick's spousal relationship with the owner and president of the company, Elizabeth Moriarty.
 
 
 10
 On summary judgment, the district court first turned to the language of the owner/operator provision. Invoking the interpretive maxim expressio unius est exclusio alterius, the court reasoned that the key term "relative" was limited by the specific examples that followed it: "father, mother, son, daughter, brother, sister." 1996 WL 535306, at * 5. No other general or inclusive terms were used to embrace other individuals who might constitute "relatives." Id. Thus, within the four corners of the collective bargaining agreement, spouses appeared to the court to have been excluded from the definition of "relative." Id.
 
 
 11
 In an effort to demonstrate an extrinsic ambiguity in the otherwise plain language of the agreement, the Funds pointed to (1) the language of the 1995 collective bargaining agreement, which as we have noted added "husband," "wife," and "in-law" to the identified examples of the term "relative" and (2) the testimony of Larry Bushmaker, administrator of the Funds and the drafter of the pre-1995 owner/operator provision, which indicated that the term "relative" was always intended and understood to include spouses. The court found that the 1995 modification demonstrated no ambiguity in the earlier version of the owner/ operator's definition of relative; it simply demonstrated that the 1995 version was substantively different. Id. at * 6. Bushmaker's testimony as to the meaning of "relative" was inherently subjective, the court reasoned, given his role as the drafter of the agreement, and thus was not the kind of objective evidence required to establish an extrinsic ambiguity in the contract language. Id. at * 6 & n. 4, citing, inter alia, AM Int'l, Inc. v. Graphic Mgmt. Assocs., Inc., 44 F.3d 572, 575 (7th Cir.1995); Central States, Southeast & Southwest Areas Pension Fund v. Central Cartage Co., 69 F.3d 1312, 1319 (7th Cir.1995) (Flaum, J., concurring in judgment), cert. denied, 517 U.S. 1134, 116 S.Ct. 1419, 134 L.Ed.2d 544 (1996). Finally, the court rejected the Funds' contention that even if Patrick Moriarty was not a "relative" of a shareholder, officer, or director as that term was defined prior to 1995, the owner/operator provision nonetheless demanded contributions on his behalf because he in fact remained a shareholder or a de facto officer or director. Although the court acknowledged that Smerwick had tendered conflicting stories as to when and how Elizabeth Moriarty had become the sole shareholder, it was clear to the court that by 1983, Elizabeth was in fact the sole owner of the company; there was accordingly no basis in the record to deem Patrick a co-owner in fact. 1996 WL 535306, at * 6. Nor did Patrick's ongoing role in company business support the notion that he amounted to a de facto officer or director of the company. Although the evidence revealed that he continued his supervisory role upon his return to the company in 1984, the court noted, there was no evidence suggesting that Patrick had held himself out as an officer or director of Smerwick. Id. at * 7.
 
 II.
 
 12
 Our review of a summary judgment ruling is plenary. E.g., Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410 (7th Cir.1997). Summary judgment "shall be rendered ... if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). To the extent that the facts are genuinely disputed, or the undisputed facts give rise to competing inferences, we are obliged to give the non-moving party--here, the plaintiffs--the benefit of the doubt. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513-14, 91 L.Ed.2d 202 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). However, our obligation to examine the record in a light favorable to the nonmovant "extends no further than the record before us." Davidson v. Midelfort Clinic, Ltd., 133 F.3d 499, 505 (7th Cir.1998). Once the party seeking summary judgment has made the preliminary showing that the facts as it believes them to be compel judgment in its favor, the party opposing summary judgment must point to some evidence in the record that establishes a pending dispute of material fact. FED.R.CIV.P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). If it has failed to do so, and the proposed facts entitle the movant to judgment as a matter of law, then the court is obliged to grant summary judgment in favor of the movant; and we are obliged to affirm that judgment. Davidson, 133 F.3d at 505.
 
 
 13
 The Funds argue that in three respects the district court erred in granting summary judgment in favor of Smerwick. First, in the Funds' view, the court ignored the meaning of the owner/operator provision's term "relative" when it disregarded the testimony of Larry Bushmaker, the administrative manager of the Funds. Second, the Funds believe that the court improperly resolved a dispute as to when (if ever) Elizabeth Moriarty became the sole owner of Smerwick by accepting her as a credible witness despite the inconsistencies in her testimony on this subject and by relying on inadmissible evidence to corroborate her testimony. Finally, the Funds assert that the evidence was in conflict as to whether Patrick Moriarty remained an owner or qualified as a de facto officer or director of Smerwick and that the court therefore erred in granting summary judgment on this question.
 
 
 14
 A. Extrinsic Ambiguity of the Term "Relative"
 
 
 15
 The starting point for the interpretation of any contract is, of course, the language itself. E.g., Freislinger v. Emro Propane Co., 99 F.3d 1412, 1420 (7th Cir.1996). The Funds do not take issue with the district court's threshold determination that the contract on its face excludes spouses from the definition of "relative" by defining that term through specific examples and omitting language that would leave the door open to other familial relations not listed in the agreement itself. See, e.g., Petrilli v. Drechsel, 910 F.2d 1441, 1447 (7th Cir.1990); Chicago Bd. Options Exchange, Inc. v. Connecticut Gen. Life Ins. Co., 713 F.2d 254, 258 (7th Cir.1983). They concede, therefore, that the contract language, standing alone, is unambiguous. Their hopes are pinned to the prospect of establishing an "extrinsic ambiguity" in the contract language, a context that gives the term "relative" a meaning different from that which one would ordinarily infer from the contract language considered in isolation. See, e.g., Pierce v. Atchison, Topeka & Santa Fe Ry. Co., 65 F.3d 562, 568 (7th Cir.1995); Cole Taylor Bank v. Truck Ins. Exchange, 51 F.3d 736, 737 (7th Cir.1995). The Funds believe that such an ambiguity finds support in the testimony of Fund administrator Bushmaker, who testified that even before the words "husband," "wife," and "in-law" were added to the contractual definition of "relative" in 1995, the term was intended to include spouses. The district court disregarded Bushmaker's testimony on the ground that it was "subjective." In the Funds' view, that characterization was erroneous.
 
 
 16
 We have pointed out on numerous occasions that Illinois law, to which the parties agree we should look in construing the pertinent provisions of the collective bargaining agreement, see Sullivan v. Cox, 78 F.3d 322, 326 (7th Cir.1996), permits the consideration of parol evidence to demonstrate an extrinsic ambiguity in a contract that is otherwise clear on its face[1] only when the tendered evidence is objective rather than subjective. Chief Judge Posner explained the distinction in AM Int'l, supra:
 
 
 17
 By "objective" evidence we mean evidence of ambiguity that can be supplied by disinterested third parties: evidence that there was more than one ship called Peerless, or that a particular trade uses "cotton" in a nonstandard sense. The ability of one of the contracting parties to "fake" such evidence, and fool a judge or a jury, is limited. By "subjective" evidence we mean the testimony of the parties themselves as to what they believe the contract means. Such testimony is invariably self-serving, being made by a party to the lawsuit, and is inherently difficult to verify.
 
 
 18
 44 F.3d at 575; see also CSX Transp., Inc. v. Chicago & North Western Transp. Co., 62 F.3d 185, 189 (7th Cir.1995); Home Ins. Co. v. Chicago & Northwestern Transp. Co., 56 F.3d 763, 768 (7th Cir.1995); Cole Taylor Bank, 51 F.3d at 737. The objective evidence requirement does give way in certain circumstances--when the parties agree as to the idiosyncratic connotation they attribute to the otherwise plain language of the contract, for example, or when fraud is alleged (and proved with clear and convincing evidence). Home Ins., 56 F.3d at 769; AM Int'l, 44 F.3d at 575-76. No such exception applies here.
 
 
 19
 Circuit precedent appears, in fact, to bar any effort by the Funds to establish an external ambiguity in the owner/ operator provision of the collective bargaining agreement. The majority in Central Cartage Co., supra, stated that "a multiemployer pension agreement is not a normal two-party contract for which evidence of idiosyncratic meaning may be used to depart from the objective meaning of the words." 69 F.3d at 1315; see also Central States Southeast & Southwest Areas Pension Fund v. Joe McClelland, Inc., 23 F.3d 1256, 1259 (7th Cir.1994) ("extrinsic evidence may not be used to create an ambiguity in a pension or welfare fund agreement subject to ERISA"). Judge Flaum took the Central Cartage majority to task for what he believed to be a misreading of our prior cases on this point. 69 F.3d at 1317-20. Unless and until we revisit this issue, however, Central Cartage would appear to make it the law of this circuit that a party may not resort to parol evidence in an effort to demonstrate an ambiguity in the otherwise straightforward language found in the type of ERISA-governed welfare benefit plan at issue here.
 
 
 20
 Even if we were to overlook this obstacle, the Funds' effort to cloud the otherwise clear and limited meaning of the term "relative" would fare no better here than it did in the district court. Like the district judge, we believe that Mr. Bushmaker's testimony as to the broader meaning that the term was intended to have does not constitute the kind of objective evidence we require to establish an external ambiguity. Although technically neither Bushmaker nor the Funds are a party to the collective bargaining agreements (the Funds simply collect and administer the contributions made by employers subject to those agreements), the Funds are a party to and have an obvious stake in the outcome of this litigation; neither they nor Bushmaker can be considered "disinterested." Moreover, because Bushmaker drafted the language in question, his testimony bears all of the hallmarks of subjective testimony: he is offering his own impression of what he believes the parties intended for the language to signify, a position that neatly corresponds to the interests of the Funds that he administers. His testimony focuses us not on the environment external to the contract--on objective factors like custom and trade usage, to which a disinterested bystander might testify--but instead is mired in the thoughts and intentions of those who drafted and signed the contract. This is classically subjective testimony, and the district court was right to disregard it. See Central Cartage, 69 F.3d at 1319 & n. 3 (Flaum, J., concurring in the judgment).
 
 B. Elizabeth Moriarty's Credibility
 
 21
 In the course of this litigation, Smerwick has presented significantly different stories as to when and how Elizabeth Moriarty began to acquire her ownership interest in the company. At first, while the parties were engaged in discovery, Smerwick took the position that Patrick Moriarty was the sole shareholder until 1983, when upon being diagnosed with cancer he sold his entire interest in the company to his wife. Both Patrick and Elizabeth so testified during their depositions (P. Moriarty Dep. 14; E. Moriarty Dep. 6); and a written response to one of the Funds' interrogatories likewise suggested that Elizabeth purchased the company in 1983 (R. 14 Tab 4 at 2).[2] Consistent with that position, Smerwick produced a form stock certificate at the close of Elizabeth's deposition (E. Moriarty Dep. 65-66) with the number "2," dated May 12, 1983, and which indicated that Elizabeth Moriarty was the owner of 100 "fully paid" shares. R. 20 Ex. 6. Elizabeth had signed the certificate as president of the company. Id.
 
 
 22
 Later, however, when it moved for summary judgment, Smerwick submitted an affidavit from Elizabeth portraying for the first time a different scenario. Contrary to her prior deposition testimony, she averred that Patrick had transferred several shares of stock to her each year as a gift beginning in 1972 and ending in 1983, when Patrick transferred the remainder of his interest in the company to her. R. 14 Tab 1 at 1 p 3. Smerwick did not submit an affidavit from Patrick at that time.
 
 
 23
 In their memorandum opposing the motion for summary judgment, the Funds emphasized the obvious conflicts in the defendant's stories and the lack of corroboration that any transfer of ownership had really taken place. R. 19 at 5-8. In that vein, they cited the stock certificate that Smerwick had produced at the close of Elizabeth's deposition, which purported to be only the second such certificate issued by the company (the first presumably showing Patrick to be the sole shareholder) and which rather than evidencing a gradual transfer of ownership to Elizabeth as a gift over a period of years, depicted Elizabeth as the sudden purchaser in 1983 of all 100 shares of the company. Id. at 6.
 
 
 24
 Then in reply, Smerwick tendered an unsigned letter on the letterhead of an accounting firm enclosing a schedule setting forth the gifting of company stock to Elizabeth that had purportedly taken place over the eleven-year period ending in 1983. At the bottom of that schedule was an acknowledgment signed by Patrick (but not under oath) indicating that "the above schedule represents the gifting transactions from myself to my wife, ELIZABETH M. MORIARTY, in the amounts and dates shown". R. 23, attachment. An accountant signed the acknowledgment next to Patrick, apparently as a witness. Smerwick also argued that whatever the inconsistencies in its accounts regarding Elizabeth's ascendancy to sole ownership of the company, the stock certificate that the Funds themselves had cited demonstrated that Elizabeth was in fact the only shareholder as of 1983. R. 22 at 3.[3] In a second affidavit, Elizabeth again averred that she had been the sole owner of the company since 1983. R. 24 Tab A p 1.
 
 
 25
 The district court noted the conflict between Smerwick's two stories when it addressed the motion for summary judgment. Whatever their inconsistencies, however, both versions posited that Elizabeth became the sole owner of Smerwick as of 1983, and in the absence of evidence to the contrary the district court accepted that fact as undisputed. 1996 WL 535306, at * 2 n. 1, * 6 & n. 5. As confirmation, the court cited the stock certificate. Id. at * 6. The court accordingly rejected the Funds' contention that doubts remained as to whether Patrick may have remained a co-owner of the company after 1983 and during the time periods for which the Funds sought contributions under the owner/operator provision. Id.
 
 
 26
 The Funds maintain that for two reasons it was inappropriate for the district court to accept as a given the notion that Elizabeth was the sole owner of Smerwick as of 1983. First, given the conflicting stories that she and Smerwick had presented as to the transfer of ownership from Patrick to her, questions were raised as to the veracity of Elizabeth and for that matter Patrick as well. To accept as true the notion that Patrick had by one means or another transferred his ownership in the company to Elizabeth as of 1983, the Funds reason, the district court had to deem them both to be credible witnesses, and giving the veering to and fro of their accounts, that was inappropriate for the court to do. Second, the Funds argue that the court effectively relied on the stock certificate to resolve any doubts about the ownership of the company after 1983. That too was an error in their view, because the stock certificate was hearsay and had not been authenticated. The Funds never objected below to Smerwick's reliance upon the certificate (which of course the Funds themselves had submitted to the court), but they claim that because the company first relied on the certificate as proof of Elizabeth's ownership in its reply brief, they were deprived of the opportunity to object.
 
 
 27
 We agree that Smerwick's about-face as to the method and timing of the transfer of ownership of the company from Patrick to Elizabeth is fishy, due not simply to the change in stories but also to the lack of explanation for the change[4] and the slipshod manner in which documents supporting the revised account were presented--the unsworn statement from Patrick identifying the gifting schedule, to name one example. Even so, we are not convinced that the district court erred in accepting as undisputed that Elizabeth was the sole owner of the company by and after 1983.
 
 
 28
 Although there are obvious conflicts within the defendant's own evidence as to the status of corporate ownership prior to 1983, Smerwick has always maintained that Elizabeth was the sole owner of the company during the contribution periods relevant to this litigation, all of which post-date 1983. On that point, the defendant's evidence is consistent; and of equal significance is the fact there is no evidence in the record to the contrary. The Funds point to Smerwick's contradictory stories as "direct evidence" that Patrick may have remained a shareholder in the company after 1983. Funds' Br.19. At best, however, the conflicts in the stories would be fodder for impeachment if this case went to trial. But the prospect of challenging a witness' credibility is not alone enough to avoid summary judgment. See Giannopoulos v. Brach & Brock Confections, Inc., supra, 109 F.3d at 411. The inconsistencies as to when Patrick began to transfer ownership of the company to Elizabeth, and whether the shares were transferred by gift or by sale, are not proof that the transfer did not take place.
 
 
 29
 As for the stock certificate, we are inclined to agree that without authentication at the very least, it did not constitute affirmative evidence confirming Elizabeth's status as the sole owner of the company. The Funds' claim that they were unable to challenge the admissibility of the certificate given that it was cited in Smerwick's reply memorandum rings a bit hollow given that the Funds themselves had submitted the certificate and referred to it in their own memorandum, and in any event the Funds had plenty of time to raise an objection while the court had the motion for summary judgment under advisement. Still, especially against the backdrop of the argument over the credibility of the defendant's switch in stories, the evidentiary problems with the certificate are rather self-evident. But even if the certificate is disregarded, the remaining evidence still establishes that Elizabeth Moriarty was the sole shareholder as of 1983. Elizabeth herself testified and averred in her subsequent affidavits that she had assumed exclusive ownership of Smerwick no later than 1983, and there is no dispute as to her competence to so testify. Patrick testified similarly. Thus, absent further documentation or contrary testimony, the record is undisputed as to who owned the company after 1983. The lack of documentation backing up this story again would certainly be a point for cross-examination had the case gone to trial, but in the absence of evidence refuting the testimony of the Moriartys does not win the Funds the right to a trial. Only if the Funds could identify evidence affirmatively indicating that Patrick remained an owner of the company after 1983 might there be a fact question on this point, and they have identified no such evidence.
 
 
 30
 C. Patrick's Status as De Facto Director or Officer
 
 
 31
 We may make short work of the Funds' final argument that a question of fact was raised as to whether Patrick remained a de facto officer or director for Smerwick after 1983 (thereby obligating the company to make contributions on his behalf pursuant to the owner/operator provision of the collective bargaining agreements). The sole evidence that the Funds have cited in support of their theory that Patrick's involvement in the company rendered him an officer or director in fact if not in name is Elizabeth's deposition testimony to the effect that when Patrick returned to work in 1984, his duties were no different than they were prior to 1983, when he was president of the company as well as a shareholder. Funds Br. 28-29; see R. 21 at 8 p 36; E. Moriarty Dep. 35. However, the portions of the deposition that the Funds cite merely establish that Patrick resumed his day-to-day role in "[s]upervising the job and the men on the job and machine operating." E. Moriarty Dep. 33; see also id. at 35. Nothing in the testimony cited to us suggests that Patrick resumed any role as an officer or director of the company.
 
 III.
 
 32
 We take up finally Smerwick's appeal from the district court's order denying, without comment, the company's motion for discovery sanctions pursuant to FED.R.CIV.P. 26(g). R. 35. Rule 26(g)(2) requires a party's counsel to sign each discovery request, response, or objection, thereby certifying that the document is not legally frivolous, that it is not interposed for any improper purpose, and that it is not unreasonable or unduly burdensome or expensive. Rule 26(g)(3) provides that when a certification is made "without substantial justification ... in violation of the rule," the court either on its own motion or the motion of a party shall impose an appropriate sanction upon the counsel who made the certification and/or the party he or she represents. The reasonable expenses resulting from the violation, including another party's attorney's fees, are cited as a permissible sanction.
 
 
 33
 Smerwick sought sanctions pursuant to this rule based on the Funds' response to a request to admit that the company served on the Funds in the course of discovery. Smerwick asked the Funds to admit or deny that the definition of the term "relative" in the owner/operator provision of the 1995 collective bargaining agreement was changed to include "husband" and "wife." The Funds denied that the definition of "relative" had been changed. They asserted that the term "relative" had always been construed to include a spouse, and that:
 
 
 34
 The omission of the words "spouse" or "husband" and/or "wife" was a typographical error. In the collective bargaining agreement effective June 1, 1995, through May 31, 2001, the typographical error was corrected.
 
 
 35
 (Emphasis ours.) Smerwick subsequently issued a number of discovery requests and subpoenas seeking, among other things, any documents that would confirm that the parties to the previous collective bargaining agreements had agreed that "relative" would include spouses and that the omission of "husband" and "wife" from those agreements had in fact been a typographical error. No such documents turned up, and ultimately, after the close of discovery, the Funds sought and received permission from the district court to amend their response to the request to admit to delete the word "typographical," which left the omission of the words "husband," "wife," and/or "spouse" simply an "error." In its request for sanctions, Smerwick essentially contended that the use of the adjective "typographical" sent it on a wild-goose chase for documents that would confirm this type of error.
 
 
 36
 Our review of the court's decision to deny the Rule 26(g)(3) request for sanctions is deferential. E.g., Rothman v. Emory Univ., 123 F.3d 446, 455 (7th Cir.1997). Unlike its Rule 11 counterpart, which now assigns to the discretion of the district court whether to impose sanctions for a violation of the rule, see FED.R.CIV.P. 11(c); In re Generes, 69 F.3d 821, 826-27 (7th Cir.1995), cert. denied, --- U.S. ----, 117 S.Ct. 81, 136 L.Ed.2d 39 (1996), Rule 26(g)(3) still requires that sanctions be imposed in the event of a violation. Rule 26 advisory committee's note (1983 amendment); see Chambers v. NASCO, Inc., 501 U.S. 32, 51, 111 S.Ct. 2123, 2136, 115 L.Ed.2d 27 (1991); Chudasama v. Mazda Motor Corp., 123 F.3d 1353, 1372 (11th Cir.1997). However, the determination whether the requisite certification was made "without substantial justification ... in violation of the rule" typically is a factual assessment turning on the unique circumstances of the case. Accordingly, we review for clear error the district court's decision that Rule 26(g)(2) was or was not violated. Id. What type of sanction to impose in the event of a violation is a matter committed to the district court's discretion, see Rule 26 advisory committee's note (1983 amendment), and our review of that decision is commensurately deferential as well. Chudasama, 123 F.3d at 1372.
 
 
 37
 Smerwick first contends that the district court was required to issue an explanation for its decision to deny the Rule 26(g)(3) request. Our cases have stopped short of imposing such a requirement on the district courts. Szabo Food Serv. Inc. v. Canteen Corp., 823 F.2d 1073, 1084 (7th Cir.1987), cert. dismissed, 485 U.S. 901, 108 S.Ct. 1101, 99 L.Ed.2d 229 (1988); Automatic Liquid Packaging, Inc. v. Dominik, 909 F.2d 1001, 1006 n. 3 (7th Cir.1990), but see Circuit Rule 50. Still, when the district court does not supply us with any explanation for its decision, it necessarily complicates our review; and it is not a practice that we encourage. Indeed, we have said more than once that the summary grant or denial of a sanctions request may constitute an abuse of discretion. Ross v. City of Waukegan, 5 F.3d 1084, 1088-89 (7th Cir.1993); AHP Subsidiary Holding Co. v. Stuart Hale Co., 1 F.3d 611, 620 (7th Cir.1993); see also Szabo Food. Serv., 823 F.2d at 1084. We recognize that district judges are burdened with heavy dockets and cannot afford to give full exposition to every written motion put before them. Even a few sentences of explanation, however, will often be enough to apprise the parties as to the court's rationale and invariably will facilitate the process of appellate review.
 
 
 38
 We have, in any case, affirmed decisions refusing sanctions without elaboration when the reasons for doing so are clear from the record, e.g., Local 232, Allied Indus. Workers of America, AFL-CIO v. Briggs & Stratton Corp., 837 F.2d 782, 788-89 (7th Cir.1988); and we believe that this is such a case. In view of the fact that Rule 26(g)(3) mandates some type of sanction for a violation, we presume that in denying Smerwick's motion, the district court found that no violation had occurred. Our review of that determination is, as we have noted, one for clear error only, and we discern nothing clearly erroneous in the district court's assessment.
 
 
 39
 Smerwick's demand for sanctions is focused on the use of the term "typographical." It was the Funds' use of that adjective, Smerwick insists, that sent it on the fruitless search for documents that would have confirmed that earlier drafts of the collective bargaining agreement had included "husband" "wife" and/or "spouse" and that these words had indeed been dropped wholly unintentionally from the final draft by virtue of clerical error. Describing an error as "typographical" does, we agree, suggest a particular kind of mistake--an error in transcription or copying akin to a misspelling, for example. It is less encompassing than the word "error" unadorned, which would embrace other mistakes--"we didn't think about it," for example-that are not typographical. But not everyone attends to the meaning of language with the precision of William Safire, and it is by no means unheard of for people to use "typographical error" as a euphemism for all sorts of mistaken omissions from documents that were not in fact the fault of the typist. Moreover, even if the Funds had described the omission as a plain-vanilla "error" from the start--and Smerwick does not contend that the use of that word alone would have been inappropriate--one still could have readily interpreted the Funds as suggesting that the parties had agreed to include spouses among the "relatives" covered by the owner/operator provision of the collective bargaining agreement but omitted to include appropriate language in the final draft by virtue of some kind of oversight, clerical or not. The same documents that Smerwick sought based on the "typographical" characterization would have been relevant to prove or disprove that more generic assertion. Thus, we are not convinced that the label "typographical" was entirely to blame for the time and effort Smerwick expended. We do not think it would have been wrong for the district court to conclude otherwise, but the district court's implicit conclusion that use of the term was not inconsistent with what the Funds reasonably understood the facts to be was by no means clearly erroneous.
 
 IV.
 
 40
 For the reasons we have discussed, we AFFIRM in No. 96-3618 the entry of summary judgment against the Funds and in favor of Smerwick and in No. 96-3724 we AFFIRM the denial of Smerwick's request for sanctions pursuant to Rule 26(g)(3).
 
 
 
 [1]
 "When judges say that a contract is 'clear on its face,' they mean simply that an ordinary reader of English, reading the contract, would think its application to the dispute at hand certain." AM Int'l, supra, 44 F.3d at 574. As we have noted, the Funds do not challenge the district court's conclusion that, on its face, the pre-1995 owner/operator provision does not include spouses within its definition of the term "relative."
 
 
 [2]
 Patrick recalled that she had paid him "about $1,000" for the company (P. Moriarty Dep. 23), while Elizabeth could recall only that she "gave him some money," but not how much (E. Moriarty Dep. 27)
 
 
 [3]
 Although Smerwick cited the stock certificate, the company did not submit any affidavit attesting to the certificate's authenticity
 
 
 [4]
 We have repeatedly noted that when a witness attempts in her affidavit to contradict her prior deposition testimony, she must articulate a plausible explanation for the departure. See, e.g., Russell v. Acme-Evans Co., 51 F.3d 64, 67-68 (7th Cir.1995). Given that they were devoid of any such explanation, Elizabeth's affidavit and Patrick's unsworn statement were entitled to no weight as substantive evidence